861 A.2d 205 (2004)
373 N.J. Super. 319
Fredrick POLUHOVICH, Plaintiff-Respondent,
v.
Alejandra PELLERANO, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued October 14, 2004.
Decided November 30, 2004.
*206 Mark Wechsler argued the cause for appellant (Einhorn, Harris, Ascher, Barbarito, Frost & Ironson, attorneys; Mr. Wechsler, on the brief).
Jan L. Bernstein argued the cause for respondent (Riker Danzig Scherer Hyland & Perretti, attorneys; Ms. Bernstein, of counsel, and Sara J. Cronin, on the brief).
Before Judges WEFING, FALL and C.S. FISHER.
The opinion of the court was delivered by
FALL, J.A.D.
In this international custody dispute involving application of the provisions of the Uniform Child Custody Jurisdiction Act (UCCJA), N.J.S.A. 2A:34-28 to -52, defendant Alejandra Pellerano appeals from an order entered in the Family Part on August 26, 2004, assuming jurisdiction, pursuant to N.J.S.A. 2A:34-31a(2), over custody and relocation issues pertaining to her children with plaintiff Fredrick Poluhovich. The issue is whether New Jersey courts have subject-matter jurisdiction to consider plaintiff's application to modify the terms of the parties' custodial agreement that had been incorporated into a judgment of divorce entered by the courts of the Dominican Republic on March 24, 2003.
After this court denied defendant's application for emergent relief, defendant filed a motion with the Supreme Court, seeking leave to appeal from the August 26, 2004 order, and emergent relief in the form of an order finding that the Family Part lacked subject-matter custody jurisdiction. On September 8, 2004, the Supreme Court issued an order, granting defendant's motion for leave to appeal and summarily remanding the matter to this court to consider, on an accelerated basis, the issue whether the Family Part has jurisdiction to proceed in accordance with its August 26, 2004 order.
We conclude that the Family Part properly exercised "emergency jurisdiction" pursuant to the provisions of N.J.S.A. 2A:34-31a(3) to consider plaintiff's allegations that it was necessary to protect the children because they had been subjected to or threatened with mistreatment or abuse or had otherwise been neglected by defendant. However, upon determining that plaintiff's allegations of an "emergency" lacked merit, the Family Part was without subject-matter jurisdiction to consider plaintiff's further contention that the best interests of the children warranted modification of the existing custodial arrangement by the transfer of residential custody to him.
*207 The following factual and procedural history is relevant to our consideration of the arguments advanced on appeal. The parties met in the Dominican Republic in 1991, while plaintiff was investigating locations for a manufacturing facility for his employer, Andin International. They became engaged in 1992 and married in December 1992. After their marriage the parties moved to New Jersey, settling in Holmdel.
Two children were born of their marriage: Fredrick Alexander Poluhovich, on October 8, 1994; and Nicole Marie Poluhovich, on October 25, 1995. The children were born in New York City while the parties were residing in Holmdel. Plaintiff, defendant, and both children are citizens of the United States by virtue of their birth here.
In 1995, plaintiff's employer asked him to relocate to the Dominican Republic to oversee the company's manufacturing-plant project. In November 1995, the parties and children moved to the Dominican Republic, where they resided in Santo Domingo. In 2000, plaintiff was asked by his employer to return to the United States to live in New York. However, in the fall of 2000, defendant informed plaintiff she wanted a divorce. The parties separated in 2001 and plaintiff relocated to New Jersey, where he has since maintained a residence. Defendant and the two children remained in the Dominican Republic. Accordingly, the children and defendant have been residents of the Dominican Republic since November 1995.
The children visited with plaintiff in New Jersey during the summer of 2001. Due to disputes between the parties, defendant did not permit the children to visit with plaintiff in New Jersey during the Christmas holiday in 2002, nor during the summer of 2002. Plaintiff would, however, periodically have parenting time with the children when he traveled to the Dominican Republic on business for his employer.
In the fall of 2003, defendant filed a divorce action against plaintiff in the Dominican Republic. On March 23, 2003, the parties entered into a written property settlement agreement in the Dominican Republic resolving all issues between them, including the issues of custody and parenting time. That agreement was incorporated into a judgment of divorce that was entered in the Civil and Commercial Chamber of the Court of First Instance of the National District of the Dominican Republic, Magistrate Judge Robert Placencia Alvarez presiding. Both parties were represented by counsel and the court issued a judgment of divorce on March 24, 2003.
Pursuant to their incorporated agreement, custody of the children was vested with defendant in the Dominican Republic and plaintiff was accorded a liberal parenting time schedule. The divorce judgment also provided, inter alia, that in the event of the death of defendant, custody of the children would automatically pass to plaintiff, and "that in any other case, such as: illness, physical disability, serious wounds, emotional collapse, among others, the [plaintiff] shall apply to the courts [of the Dominican Republic] in order to request the transfer of the custody of the children in his favor, all in consideration of the condition of father[.]" In accordance with their incorporated agreement, the children visited with plaintiff in New Jersey during the 2003 Thanksgiving holiday, for ten days in January 2004, and for ten days in April 2004.
The current jurisdictional dispute arose after the children came to New Jersey to visit with plaintiff in early June 2004. The children were scheduled to return to the Dominican Republic on August 2, 2004. On July 8, 2004, plaintiff sent the *208 following message to defendant in the Dominican Republic by e-mail transmission:
Alejandra:
Probably the one thing that we share in common is the love for the kids. They have spent some time telling me that you have given them the choice of whether to go to live in Norway or to live with me here in New Jersey. They have told me, rather emphatically, that they have decided that they want to live here. They have asked me to take them to see schools and I have done so. The programs look very good and they have expressed to me that they really like the school and are excited to go there. There are accelerated programs for advanced children which Fredrick liked a lot especially for mathematics. Nicole was very happy to learn that the school has an orchestra and told the principal that she really wanted to learn the flute. They also asked me to show them what things there are for children in the way of after-school activities such as sports leagues, music classes, etc. and I have also accommodated their wishes and shown them what happens in the town. They again were very excited to learn about these things and to talk about participating in them. They have made many new friends here and are doing very very well. They are already enrolled in a baseball school and enjoying the classes very much. I have tested them very carefully as regards their decision and it seems that their thought process was clear and mature. They have expressed to me however that they are afraid that you might scream at them, so please try to understand that and not make them afraid. They do not want you to be disappointed in them at all and I think it would be harmful to them if they got that idea. Of course, since I understand these circumstances, I am ready to talk with you about a transition plan that works for all and ongoing communication with them, given the distances involved as I think it very important that you stay in close contact with them. I am sure that you will want to speak with them about this so you should be aware that we are actually taking our first overnight trip this coming weekend to Washington, D.C. They have wanted to see it for a few years and we leave Sunday morning and return on Tuesday evening. During this time, I will have my cellular phone on, but I am sure that reception will be poor in the museums. I would guess that the best time to catch them would be 9 AM New York time during these days. They will be at home tomorrow except for a few hours at the pool and on Saturday we are going to a family reunion so the cell would be best again.
I look forward to speaking with you about this transition and try to work it out as smoothly as possible.
On July 16, 2004, defendant replied to plaintiff's message, also by e-mail transmission, as follows:
Hi [F]red[.] I totally agree with you when you say that we share in common the love for our children, and I would add that this love is unquestionable.
We need to remember though that we can harm people that we love. I feel that the level of conflict between us and the incapability of communication at all levels is very damaging to the children. This case is just one more in a line of many.
In order to co-parent, adults need to communicate directly and not through the children in order to shelter the children from adult conflict, and once adults have found a sound platform to work on, the kids can be brought in to express their thoughts[,] concerns and feelings, *209 which of course are very important and need to be handled properly. I have been trying to speak to you for the last two months and have not been able to.
Sadly, I have no other choice than adopting the style of communication imposed by you, and in that scope, my response is the following:
The contents of your e-mail of the 8th of this month shows that you have been taking advantage of the stay of Nicole and Fredrick with you in order to attract them and show them schools, music programs, sports, etc., seducing them with the sweet words and promises so that, as you say in your communication, for them to have been able to have "... said, emphatically, that they have decided that they want to live with you". You forget that neither they nor you can "decide" a change of custody which we agreed to contractually and was certified by civil sentence XXX-XXXX-XXXX of 24 March 2003 handed down by the Civil and Commercial Chamber of the Court of the First Instance of the D.N., Fourth Hall, with this content:
"... the holding, custody, oversight and care of the minor children, with all the legal duties and consequences [that] this implies, during and after the divorce procedures will be under the charge of the mother, Mrs. Alejandra Pellerano, who at all times must observe, with respect to her children, the excellent care of a good mother."
Abiding by the divorce agreement with respect to the summer vacations and trusting in your responsibility and integrity, I delivered the kids with the obligation that you return them personally to the country on the 2nd of August.
Mandated by the divorce sentence you and the children, the latter for lacking legal standing, cannot disregard my right of custody, which solely and could exclusively be modified by an agreement between us, which is not the case, or by a judicial sentence that revokes the existing one.
I trust that you will not commit an arbitrary illegality by not delivering the children to me on Monday, August 2nd, as agreed to.
The kids and I have agreed that once they are back with me the 2nd of August, we can take all the time in the world for them to express their thoughts and feelings as we understand that the phone is not the best way to handle this.
On July 27, 2004, plaintiff filed a verified complaint against defendant in the Family Part, seeking an order granting him sole legal and sole physical custody of the children. In his complaint, plaintiff alleged that defendant was planning to move to Gjovic, Norway with the children to take up residence with her boyfriend. He more specifically alleged in the complaint, in pertinent part:
3. Defendant is unable to properly care for the minor children, or to adequately tend to their custody, education, health, welfare or maintenance. Defendant cannot be entrusted with the role of legal or residential custodian of the minor children. The safety, happiness and welfare of the minor children require that plaintiff be given their care, custody, education and maintenance, and that plaintiff be granted sole legal and sole physical custody of the minor children by judgment of the Court.
* * * *
5. It is in the best interests of the minor children that plaintiff be granted sole legal and sole physical custody of the minor children in New Jersey, that the minor children reside with plaintiff in the State of New Jersey, and that this Court have jurisdiction over all issues *210 affecting the minor children, including but not limited to custody and support for the following reasons:
a. Since the plaintiff's relocation to New Jersey, defendant has become increasingly verbally and physically abusive of the minor children. Defendant screams at the children in such a violent manner that the children become terrified of defendant and shake in fear of her. Defendant also strikes the minor children and pulls Nicole's hair.
b. Defendant is neglectful of the children's care and well-being. Defendant leaves the children without proper adult supervision all day and late into the night. The children are prohibited from leaving the home and thus are compelled to remain in the home with only a neglectful nanny. The children's eating habits are not supervised, causing the children to be malnourished.
c. Defendant is relocating to Norway on August 10, 2004 to reside with an unrelated male. Defendant has not provided plaintiff with any information regarding her intended home or any information regarding this unrelated male with whom she intends to reside with the children. The children do not speak Norwegian. Defendant intends to enroll the children in a school where the classes are taught in Norwegian. When defendant brought the minor children to Norway in the winter of 2003, they stayed in a bedroom without heat.
d. Defendant has willfully and wrongfully withheld the minor children from plaintiff in order to extract monetary sums from plaintiff. Despite the parties' oral agreement, defendant refused to allow the children to accompany plaintiff to New Jersey for the 2001 Christmas holiday. Defendant also refused to allow the children to accompany plaintiff to New Jersey for their summer vacation in 2002, even though the parties had agreed to same. Defendant only allowed plaintiff to have the children come to the United [S]tates once he acquiesced to her demands for large sums of money.
6. Defendant is not capable of providing the minor children with a safe or healthy environment, and has continually interfered with plaintiff's custodial rights. The minor children were residents of New Jersey until 1995. The children have resided in New Jersey periodically since 2001 and have currently resided in New Jersey since June 2004. The children have doctors and a health care plan in this State, and have numerous family members and friends in this State. They and their father, the plaintiff, have a warm, loving and trusting relationship, and a deep bond. The minor children will suffer immeasurable physical and emotional harm if returned to defendant's custody. Therefore, it is in the best interests of the minor children that plaintiff be entrusted with their sole legal and sole physical custody and care in New Jersey.
Upon the filing of the verified complaint, plaintiff sought emergent relief from the Family Part in the form of an order immediately vesting custody of the children with him. In his supporting certification dated July 26, 2004, plaintiff stated, in pertinent part:
4. Recently, I have learned, and only with the assistance of a therapist, that our children, Nicole and Fredrick, would be in danger if returned to Alejandra's custody. Alejandra has a violent temper and, I have discovered, that she emotionally and physically abuses our children. Moreover, she is extremely neglectful of them, leaving them in the care of ever-changing nannies. The children have almost no adult supervision *211 or attention of any sort when they are in Alejandra's custody. If they are returned to their mother, the children will be in danger of emotional and physical harm.
5. The children, especially Fredrick, always have been reticent to discuss ... these issues. However, when they came to visit me this summer, I began to believe something was wrong. I immediately sought therapeutic help for the children. After much research and upon the recommendation of multiple pediatricians, I took the children to Dr. Michaela Schaeffer for treatment. Only through therapy have the children been able to reveal the extent of the neglect and abuse they have suffered in Alejandra's custody. This breaks my heart. I love these children more than life itself.
6. Alejandra has resided in the Dominican Republic. I frequently have business in the Dominican Republic and usually would see our children for one week every one or two months, in addition to the summer and other vacations that they spend with me. However, now Alejandra is moving with her boyfriend to live together in a remote town in Norway on August 10. She did not consult me about this move at all. She simply told me she was doing it. I know nothing about her boyfriend other than he works in the same company as Alejandra, has two children, and until recently lived in Miami, Florida. Alejandra's move would be extremely detrimental to the children. In addition, my parenting time would be drastically reduced as I do not have any opportunity to travel to Norway.
7. The children have been in my care this summer and were scheduled to return to the Dominican Republic on August 2. As the children prepared to come to New Jersey for the summer, their mother informed them and me that it would be up to them to choose where to live: Norway or New Jersey. I believed this placed an unreasonable burden on our children, who are bright and articulate, but still young. I asked Dr. Schaeffer to speak with them, and to help us sort out this residence issue. I did not wish to interfere in the children's process, and wanted them to get some therapeutic help, which they seemed to need. The children desperately want to remain in New Jersey. When the children and I informed Alejandra that they wished to remain here with me, Alejandra flew into a rage and began screaming at the children. The children became hysterical and Nicole literally trembled in fear. I believe that the children will suffer reprisals if returned to Alejandra's custody. She even threatened the children that she will come and remove them from our New Jersey home before August 2. I am truly concerned that she will forcibly remove the children, remove them from this country, and keep them from me.
* * * *
41. The children are well-established in our community. Even though I am the full-time resident, I am known by many as Nicole and Fredrick's father. They have visited the town in Norway where [their] mother is moving, but are very clear with Dr. Schaeffer and me that they want to stay in New Jersey in no uncertain terms. I am proud of their thought-process and the help they have received in therapy. Respectfully, it is in their best interests to remain in the community that they know and love, with me, their father. Alejandra's abusive and neglectful behavior places them in jeopardy when they are in her care. I respectfully request the Court restrain Alejandra from removing the children *212 from New Jersey and grant me temporary physical custody of them pending a plenary hearing on the issue of a permanent change in residential custody.
Having outlined the alleged threatened danger and harm to the children, and citing primarily to our decision in Marcrum v. Marcrum, 181 N.J.Super. 361, 365, 437 A.2d 725 (App.Div.1981), the supporting brief submitted by plaintiff to the Family Part requested that the court exercise emergency jurisdiction pursuant to N.J.S.A. 2A:34-31a(3), "to ensure the safety of the children."
The request for entry of a temporary order of custody was presented to the Family Part by plaintiff, ex parte, on July 28, 2004. The following colloquy occurred between the judge and plaintiff's counsel on the issue of jurisdiction:
THE COURT: Now, I read your letter memorandum.
COUNSEL: Yes.
THE COURT: Which talks about the issue of jurisdiction primarily, right?
COUNSEL: Emergent jurisdiction.
THE COURT: Emergency jurisdiction. Now, this is not obviously a matter under the JCC  what is it the 
COUNSEL: It is actually a UCCJA. It defaults to UCCJA because the children  Dominican Republic is not a signatory [of the Hague Convention], but New Jersey follows a UCCJA in those circumstances.
THE COURT: Yes. But I mean the UCCJA would be sort of  we have the uniform law among the states; right? It'sa 
COUNSEL: Oh, no. But they interpret state as also a foreign country. That is the law that guides us here.
THE COURT: So I should use that template in dealing with an international case like this.
COUNSEL: Yes. That's our understanding.
THE COURT: With an entity that does not subscribe to the Hague Convention.
COUNSEL: That is correct. That is correct. Both for emergency jurisdiction and what we will later discuss with Your Honor, hopefully if Your Honor enters this order to show cause, for ongoing jurisdiction.
THE COURT: Why didn't you notify the defendant of this application.
COUNSEL: We did not notify the defendant specifically after we heard that she had threatened to come remove the children from the State prior to August 2. We don't know what would potentially happen here with the children. And giving her notice we were afraid would motivate her to come and remove the children from the State. And then we'd be in dire trouble.
After ruling that he would enter an order of temporary custody, the judge stated, in pertinent part:
I didn't specifically address the jurisdiction issues, however, there is, as I said earlier, the plaintiff has filed with the court a brief noting that the court has emergent jurisdiction pursuant to N.J.S.A. 2A:34-31a(3), which provides, among other things, that ... when a child is physically present in the State and, quote, "it is necessary in an emergency to protect the child because he has been subjected or threatened with mistreatment or abuse or is otherwise neglected, the court has jurisdiction."
There is an inherent concept that the courts of this State in the interest of children, their best interest, may exercise jurisdiction when the safety and welfare of children are in jeopardy. And *213 the plaintiff has cited several cases to support that broad and seminal concept.
The court accepts that concept at this stage. And so it's under that basis that I enter this order.
The judge then issued an "Order To Show Cause With Emergent Relief" on July 28, 2004, that granted plaintiff temporary physical and legal custody of the children, and restrained both parties from removing the children from New Jersey. The order set a return date for August 9, 2004, at which time defendant was to show cause why the restraints should not be continued pending a final order, and why the following relief should not be granted:
1. Setting a plenary hearing for a permanent change in residential custody of the minor children to plaintiff;
2. Holding in camera interviews of the parties' children, Nicole and Fredrick;
3. Granting plaintiff physical custody of the parties' children, Nicole and Fredrick, pending a plenary hearing;
4. Terminating plaintiff's child support obligation to defendant;
5. Compelling defendant to reimburse plaintiff within ten days the sum of $10,800, representing the funds plaintiff paid for private school in the Dominican Republic which were removed by defendant; and
6. Granting any other relief the Court deems fair and equitable.
The order also required service of the order, complaint, and all supporting papers by e-mail within three days, and provided that defendant could move to vacate the temporary restraints in the order upon two days' notice to plaintiff.
On August 6, 2004, defendant filed opposing papers to plaintiff's application. Along with her certification, defendant submitted the affidavit of the children's pediatrician in the Dominican Republic, Dr. Roberto M. Herrera, stating that the children have been his patients since November 28, 1995; that they are healthy and normal children; that defendant treated the children with kindness; and that she always attended to all of their medical needs. Dr. Herrera also submitted copies of his office records documenting many office visits and that all appropriate vaccinations had been given to the children. A similar affidavit was attached to defendant's certification from the children's dentist, Dr. Giancarlo Brache Ginebra, who outlined the regular dental care received by the children and opined that the children and their mother have an excellent relationship. Also attached was the affidavit of Dr. Nelia Abreau de Rojas, the children's nutritionist, who stated that the children were doing well and that defendant "demonstrated all her interest in the well-being of the children and I appreciated her good treatment, love and dedication towards her children as exemplary." Dr. de Rojas also recounted one occasion on June 23, 2003, when plaintiff had accompanied the children to their appointment, during which "he manifested his agreement with the treatment his children were receiving and the continuation thereof during the vacations."
Defendant submitted additional documentation concerning her care and treatment of the children, including an affidavit from Fredrick's golf instructor at the Santo Domingo Country Club, who concluded that Fredrick is "a happy boy, sociable, respectful and very smart[,]" with "very good interpersonal relationships with his friends." An affidavit from Alexis Guzman, Nicole's cycling instructor, was also submitted, noting Nicole's enthusiastic participation in cycling and defendant's active participation and support of this activity for her daughter. Numerous school records of the children were also submitted *214 by defendant, demonstrating their high academic skill, progress and achievements. In her opposing certification, defendant stated, in pertinent part:
3. What is conspicuously absent from plaintiff's certification is any objective proof of any of his allegations. There are no welfare or social service agency records of any complaints by him or anyone else regarding any problem with the children; there are no school records indicative of the children having any academic or behavioral problems; there are no police reports of any investigations or problems respecting the children and, significantly, there is no certification verifying any of plaintiff's allegations from the "child advocate" psychiatrist who he has enlisted to assist in his efforts to steal our children.
* * * *
5. It is against this documented factual background which verified that Nicole and Fredrick are physically healthy, academically accomplished and socially well adjusted that plaintiff makes his absurd unsupported and unsupportable accusations of abuse, neglect, etc.
6. Plaintiff alleges that I have a violent temper and emotionally and physically abuse the children and am neglectful of them [paragraph 4 of his certification]. What is his support for these allegations? Are there DYFS reports, reports of other social service agencies; police reports; medical reports?
* * * *
9. Further, if plaintiff really had input from pediatricians and therapists indicating that our children were neglected and abused would not those health professionals been compelled by law or their own professional ethics to make referrals to appropriate government agencies?
10. Plaintiff's certification contains an inordinate amount of rhetoric respecting our marriage, negotiations in our divorce, his purported rights in a Dominican Republic divorce, legal advice he received and other irrelevant information. My understanding of this litigation is that the New Jersey Court must make only one decision  is there sufficient credible evidence to determine that Nicole and Fredrick are in imminent danger such that this Court should seize emergent jurisdiction over this matter. Allegations by plaintiff of any other subject matter is completely irrelevant and should be disregarded by the Court. Accordingly, my silence respecting many of plaintiff's allegations should not be misconstrued as acquiescence to his allegations. I simply will not dignify many of the lies and deliberate misrepresentations plaintiff has made for the purpose of distracting the Court from the fact that his application is meritless and his allegations of abuse and neglect are unfounded.
* * * *
24. I reviewed an E-mail sent to the Court from plaintiff's attorney indicating that Dr. Schaeffer would not submit a Certification to the Court. I took it upon myself to speak with Dr. Schaeffer and confirmed with her directly that she will not support plaintiff's allegations either by Certification or appearance in Court. Without any statements from an independent objective source plaintiff's allegations are nothing more than unsupported hearsay.
25. Attached hereto as Exhibit L is a copy of the Mother's Day card Fredrick gave to me in May. On the third *215 page of the card Frederick wrote to me: "... I love you. You take care of me and you don't let people hurt me and you do not let nobody scare me when I'm scared you take it away." This content is interesting in light of plaintiff's paragraph 25 where he alleges that "Fredrick has stated that he does his best not to displease [me] so that he will not be yelled at or hit ... Fredrick still has problems discussing the abuse he has suffered."
26. In his own hand Fredrick praises me for protecting him while his father alleges he is afraid of me. I will leave it to the Court to assess the credibility of plaintiff's accusations in this regard.
Defendant further explained that she had met Christian, her fiance, while working in a multinational Norwegian company, while he was heading the company's Latin American activities and living in Miami, Florida. She stated that Christian had been required to move to Gjovik, Norway to take a position at the company's headquarters. Defendant asserted that she had gradually introduced the children to Christian, that they like him, and "understand clearly that a step father would never replace their own father." Defendant stated that discussions with the children about a potential move to Norway led to their request to visit Norway, which was done in May 2004. In further explaining the circumstances, defendant certified:
34. I personally advised plaintiff about my intended travel with the children to Norway as far back as Thanksgiving 2003. He was non-responsive about the issue.
35. I provide this information about Norway and my plans to marry and relocate to the Court not because I ask for a determination as to whether the children may move with me to Norway, as I believe the New Jersey Court lacks the jurisdiction to do so, but rather to refute plaintiff's malicious inferences that there is something secretive and nefarious about this intended relocation.
36. Plaintiff came before this Court on July 27, 2004, seeking emergent relief without providing any notice to me. He made unsupported accusations about me and my care of our children and succeed[ed] temporarily in keeping the children from me and compelling me to visit them only in his presence.
37. I have been the children's primary and more often than not their exclusive care giver. I have demonstrated herewith via independent documents and affidavits of third persons that the children are flourishing under my care.
Also on August 6, 2004, plaintiff filed a supplemental brief with the Family Part, for the first time contending that the court had jurisdiction to determine the ultimate question of custody of the children based upon application of the provisions of N.J.S.A. 2A:34-31a(2), asserting that the children and plaintiff have significant connections with New Jersey. Plaintiff outlined numerous facts that he contended established that the children have a significant connection with New Jersey, as follows:
1. The parties' son, Fredrick, is an American citizen, born in New York City.
2. The parties' daughter, Nicole, is an American citizen, born in New York City.
3. The children hold United States passports.
4. Ms. Pellerano also is only a citizen of the United States, she was educated in the United States and Canada.
5. Mr. Poluhovich is an American citizen.

*216 6. Mr. Poluhovich holds a United States passport.
7. Mr. Poluhovich has been a resident of New Jersey since 2001. He was born in New Jersey and has lived in this state for all but seven years of his life.
8. Mr. Poluhovich maintains medical insurance for the children through his employment here.
9. While in the Dominican Republic, the children attended an international school taught entirely in English and based on an American curriculum. All text books were in English.
10. The children have extensive family in New Jersey and neighboring Pennsylvania, including their paternal grandparents, aunts, uncles, and cousins, with whom they have a close relationship.
11. The children have established numerous friendships in New Jersey, including their best friends, Steven and Nicole.
12. The children are registered parishioners of St. Rose of Lima church in East Hanover.
13. The children are members of the East Hanover library and enjoy frequent trips there.
14. The children are members of the East Hanover town pool, where they have met their potential classmates.
15. The children love amusement parks. They have held season passes to Hershey Park. They are frequent visitors to Funplex, a large amusement center in East Hanover.
16. Both the children have regularly visited physicians and dentists in New Jersey.
17. The children attend baseball camp in New Jersey.
18. Throughout their time in the Dominican Republic, the children enjoyed extended stays in New Jersey, including in 2004 alone, and ten days in January, ten days in April, and since early June through the present day continuously.
19. Even while in the Dominican Republic, the children read books written in English. The parties' daughter, Nicole, is a Harry Potter fanatic.
20. Even during their time in the Dominican Republic, the children watch American movies and television. They both love Disney cartoons. The parties' son, Fredrick, is a Spiderman fan. Nicole enjoys Shirley Temple and Orphan Annie.
21. The children are baseball fanatics. They both root for the New York Yankees, their favorite team.
22. Mr. Poluhovich is a volunteer firefighter in his community and the children are consequently involved in the activities of the Fire Department.
23. Mr. Poluhovich owns a four bedroom, two and one-half bathroom home in East Hanover, New Jersey, with separate decorated bedrooms for the children.
24. Mr. Poluhovich files New Jersey tax returns.
25. Mr. Poluhovich maintains a New Jersey driver's license.
26. Mr. Poluhovich has a New Jersey voter registration card, and votes in New Jersey.
Alternatively, plaintiff argued that the Family Part may assume jurisdiction pursuant to N.J.S.A. 2A:34-31a(4), where there is no other court with jurisdiction *217 over the issue of custody, on the basis that defendant was severing her and the children's ties with the Dominican Republic as of August 10, 2004.
On August 9, 2004, a hearing was conducted in the Family Part on the return date of the July 28, 2004 order to show cause. After considering the arguments of counsel, the judge concluded that he would conduct an in camera interview with the children, and solicited questions and areas of inquiry from each party. The judge also determined that he would telephonically discuss the issue of the children's safety with Dr. Schaeffer. The court also directed that the parties and children be interviewed by Dr. Sharon Montgomery, a psychologist, to determine whether plaintiff had presented a prima facie showing of harm or danger to the children if the court did not take jurisdiction. The court issued an order on that date denying defendant's request for a stay.
On the afternoon of August 9th, the judge separately interviewed the children in the presence of a female court employee. The record of the interview discloses that the children expressed a preference to reside in New Jersey with their father. The court made no ruling on the jurisdictional issue at that time but directed that the parties and children be interviewed by Dr. Montgomery on August 11, 2004.[1] The court entered an order on August 9, 2004, denying defendant's request for a stay.
On August 11, 2004, defendant presented an emergent application to this court, seeking leave to appeal, for a stay of the order requiring the interviews by Dr. Montgomery, and for a summary determination that the Family Part lacked jurisdiction to entertain plaintiff's applications. Plaintiff filed papers opposing defendant's application, contending that the Family Part had jurisdiction over the custody of the children under the provisions of N.J.S.A. 2A:34-31a(2), -31a(3), and -31a(4). On August 12, 2004, Judges Newman and Fall of this court issued an order denying defendant's application, stating:
Based upon the exercise of jurisdiction by the Family Part solely under N.J.S.A. 2A:34-31a(3)(ii), the "emergency jurisdiction" provision of the Uniform Child Custody Jurisdiction Act (UCCJA), N.J.S.A. 2A:34-28 to -52, we deny defendant's motion for leave to appeal and application for a stay. In light of the children's educational needs and stability, it is expected that the issue of whether or not "it is necessary in an emergency to protect the child[ren] because [they have been] subjected to or threatened with mistreatment or abuse or [are] otherwise neglected[,]" N.J.S.A. 2A:34-31a(3)(ii), shall be expeditiously determined by the Family Part in accordance with the principles articulated in Benda v. Benda, 236 N.J.Super. 365, 371 [565 A.2d 1121] (App.Div.1989), Marcrum v. Marcrum, 181 N.J.Super. 361, 364 [437 A.2d 725] (App.Div.1981), Hache v. Riley, 186 N.J.Super. 119, 124-29 [451 A.2d 971] (Ch.Div.1982), and other applicable law pertaining to the limited exercise of "emergency jurisdiction."
On August 12, 2004, the testimony of Dr. Montgomery was taken in the Family Part via teleconferencing. Dr. Montgomery stated, in pertinent part:
First of all, let me say these are beautiful children. By the way, they are, you know, well cared for, lovely children. And I saw them both individually. I did not see them together.

*218 I ... discussed a variety of things with them besides the issues ... at hand here. I felt that both kids really ... had a good sense of why they were coming here. Obviously, they'd already ... spoken to the judge previously. So they were well aware of the conflict, the nature of this, and were well prepared to come in here with their litany of issues, which I'm assuming has been repeated several times over.
I felt when I tried to get specifics from them regarding this list and litany, there was much vagueness and inconsistency between the two children. Okay.
Clearly, one has to look at this also within the context of this divorce, because from interviewing both children it became very, very clear to me that their perception from day one was that the divorce was their mother's fault, their mother's idea, and that their father here is the victim and the injured party. So ... there's a lot of ... sympathy and blame that dad is the more hurting one and ... mom is the one that has gone on with her life and this was her idea.
So I think, historically, since this has been going on, the kids have had difficulty going back. This is not a new thing, and I think they truly miss their dad. I think they have a good relationship with him. I think they truly miss him. I think Nicole in particular ... has really grieved ... the loss of her father and the parents' divorce. And the fact that there's this intercontinental divorce thing I think has been very hard and stressful for those kids. And I think that is very, very clear, to me, that that is very genuine.
And I think that they also perceive that this move to Norway involves more loss. It's almost like they're going to experience another divorce here. In fact, for them, it's nothing but loss and negativity from soup-to-nuts.
In fact, out of Nicole's mouth, everything's negative. You know, everything to do with the Dominican Republic, for school, hates her friends, ... it was just so ... imploded and exaggerated. Everything in Norway is disgusting.... Whenever you see that, you're ... kind of suspicious. Okay?
But the kids clearly have been told by their father, and have processed this with the therapist also, I'm assuming, that Norway means ... it takes 14 hours to get there. They'll lose their mother because she's going to be married to this other person. They're going to have to share their mother with these other kids that they can't even talk to. That they won't get to see their dad in the [Dominican Republic] as much because he typically goes there and touches base with [them].
So ... this has been the constant topic of conversation, by the way, since they have been here.... [T]his has been worked over up one side and down the other with the dad and the kids and this therapist. And that was made eminently clear to me by everybody, including the dad who acknowledged ... that that had taken place. And the ... little boy, Fredrick, I felt was much more credible than the daughter. And he said that, yes, this was basically most of what they've been talking about.
Now, it's the children's perception ... they came under the belief system that they were empowered to choose where they wanted to live. And they feel that that's what their mother said to them.
I don't think that's what their mother said to them. I think she said something to them that clearly, given their ages and their concreteness of their *219 thinking, got processed that way. And I don't doubt that for five seconds.
* * * *
Cutting to the chase here in terms of the issue, you know, abuse and substantiated abuse, I do not think these kids have been physically or psychologically abused. The ... portrayal that the mother gave me and the portrayal that the little boy gave me were almost identical....
* * * *
[D]id she ever swat her kids on the bottom? Absolutely. Has she yelled at them? Absolutely.... [S]he wasn't minimizing any of that. But in terms of real, substantiated abuse as I know it from ... having directed a child abuse program for ten years, that's not what we were talking about.
* * * *
I think this is being prompted, basically, by the real fear of loss and change around this move to Norway. And in the end, both children actually said that to me when I asked them directly. I said what's ... the real thing ... here for you, and it was, absolutely, mom remarrying and moving to Norway. So that's where we are.
* * * *
They have a fear of moving to Norway.... I don't think they have a fear of their mother.... Neither child in here demonstrated any fear, anger, or anything. In fact, Nicole had a smile... on her face the whole time.
I didn't feel either one of these children were traumatized, or that their ... emotional state matched what they were telling me. It was very rehearsed, ... as if they had repeated this I don't know how many times.
When asked by the judge as to whether, "if they were to go to Norway, would this, in your judgment, constitute a form of abuse or neglect[,]" Dr. Montgomery answered:
No. It would not. Would they have adjustment difficulty? Absolutely. You know, would they have ... to learn the language, a new school, new friends. I think that's very scary for kids. But they clearly view that if they move to Norway, it's going to have some very bad impact on their father and their relationship. That's the real fear here, as if somehow this is really going to be bad for dad.
On August 13, 2004, the Family Part considered defendant's motion to dismiss the complaint or, in the alternative, to transfer custody to her here in New Jersey or provide her substantial overnight parenting time. Prior to hearing argument on the application, the judge made the following preliminary comments:
So we have a number of issues here. And I must say that after hearing Dr. Montgomery, she has confirmed the thoughts that this court had. She has underlined, I think, valid reasons for the court to believe that certainly under the child abuse and neglect aspects of the ... jurisdictional statute, there really is no basis for this court to assert jurisdiction on those grounds.
I'm more troubled by [N.J.S.A. 2A:34-31a(2)] of the statute, which talks about best interest, contacts with the State of New Jersey, and issues in that regard. Yesterday I was informed by counsel for the ... defendant that the defendant intended to file a proceeding in the Dominican Republic.

*220 * * * *
Here's the problem I have. Number one, and I make a finding on the record right now, that I don't find abuse and neglect here on any level. There is no record to allow it. What I have is a series of hearsay statements, in [plaintiff's] certification, regarding aspects of the care and treatment of the children while they're in the Dominican Republic.

On the contrary, I have received from the defendant first-person affidavits from various people who have interacted with the children indicating that, in fact, they live a relatively busy life. It may not be the same as they might live here in Morris County, but people make choices and they live their lives. There's a right of people to live their life in ... a certain way. So I start with that reality. I have no direct evidence of abuse and neglect, other than [plaintiff's] hearsay certification.
Number two, even though [plaintiff] gave me hearsay certifications, I felt it was important for me to test, at least to the extent I could, the credibility of these allegations from the perspective of the children. I interviewed them, Sharon Ryan Montgomery interviewed them. Sharon Ryan Montgomery is a recognized expert in the field of child abuse and neglect. She concludes, that while the children may have a perception favoring the father, it is more a function of their being influenced by him since almost the moment they came here to New Jersey. They have been coached.

* * * *
Well, there we go to [N.J.S.A. 2A:34-31a(2)], which raises a number of very interesting issues. If we don't have issues of abuse and neglect, and I find we don't, for reasons that the record is simply inadequate, then we come to a best interest, am I not right that the ... plaintiff ... himself submitted to the jurisdiction of the Dominican Republic, not because he ... lived there. That's where they lived.
* * * *
[Plaintiff] lived there for five years. This wasn't like they drive on down to the Dominican Republic to ... get some quickie divorce or something, and they ... put in a clause for custody[.]... They were legitimate domiciliaries of that country.
[Emphasis added.]
Counsel for defendant represented that defendant desired to return to the Dominican Republic with the children, engage in therapy with them, involve plaintiff and, at a point in time when the children are adjusted to the idea of relocating, then move to Norway. Noting that it had been represented that defendant had filed an application in the Dominican Republic, the judge stated, in pertinent part:
[Plaintiff] can make his argument or file his point of view before the Santo Domingo Judge. I then get a feel and try to coordinate what's happening here in the United States with Santo Domingo. I'm going to assume, frankly, and I would prefer, frankly, that this ... litigation occur in Santo Domingo. I said that earlier. If it's going to be [custody] litigation, it should occur where these parties did reside, where the children did reside primarily. The ... defendant has substantial ties to the Dominican Republic, as I understand it. I then open a line of communication, and then whatever is residual gets sent down to the ... Dominican Republic with the children and [defendant] and they continue to go to school where they went to school[.] ...

*221 * * * *
Here's my order. My order today is that the children will be placed in the custody of the defendant here in the United States. They will ... be with the defendant here in the United States. She shall not, however, remove them from the State of New Jersey ... except with the prior order of this court.
Testimony was then taken from defendant, who agreed to remain in New Jersey with the children until the court had an opportunity to determine whether the Dominican Republic would consider the contested issue of custody. Defendant also testified that although she had plans to move to Norway with the children, her primary concern was the children and she would, if necessary, terminate her relationship and concentrate on the children. Under that condition, the judge placed physical custody of the children with defendant and directed both parties to pursue the custody issue in the Dominican Republic, noting that "[t]he situation in New Jersey can only be temporary likely." An order memorializing the court's decision was entered, nunc pro tunc, on August 17, 2004.
On or about August 17, 2004, defendant filed another application with the Family Part seeking dismissal of plaintiff's complaint on the basis that on August 13, 2004, she had filed a complaint in the Court of Children and Adolescents of the National District, Dominican Republic, seeking enforcement of her custody rights in accordance with the March 23, 2003 judgment incorporating their settlement, and to impose sanctions against plaintiff. In her supporting certification dated August 16, 2004, defendant stated she planned "on returning to the Dominican Republic and remain there while the litigation in the Dominican Republic proceeds and while our children are enrolled in therapy." Defendant stated that the children were scheduled to resume their schooling in the Dominican Republic on August 30, 2004. In a supplemental certification dated August 17, 2004, defendant stated, in pertinent part:
10. It is my desire to immediately return to Santo Domingo with the children. I want to be able to return the children to their school there when the school year resumes on August 30, 2004. I want the children to engage in therapy as soon as possible. I have no intention of even considering leaving Santo Domingo until after the children's emotional needs are addressed in Santo Domingo and after plaintiff has an opportunity to be heard on that issue in the Courts of the Dominican Republic should the Superior Court of New Jersey dismiss this matter to concede jurisdiction to the Dominican.
On or about August 19, 2004, plaintiff filed an application in the Family Part seeking an order retaining jurisdiction and restoration of physical custody of the children to him pending a full custody hearing. In his supporting certification, plaintiff contended that since the court had transferred physical custody to defendant on August 13th, he had been refused overnight parenting time with the children and had been provided limited contact with them. Plaintiff asserted that defendant's application to the Dominican Republic court failed to mention the New Jersey court proceeding; contended that he had illegally withheld the children from her; failed to mention defendant's contemplated move to Norway; and sought his incarceration.
Plaintiff submitted a copy of a United States State Department travel advisory dated August 18, 2004, that stated the Dominican Republic is not a party to the Hague Convention on the Civil Aspects of International Child Abduction; there are *222 no treaties in force between the Dominican Republic and the United States dealing with international parental abduction; and that:
Normally, in the Dominican Republic if the parents are legally married they share the custody of their children. If they are not married, by law the custody is granted to the mother unless there are known facts of inappropriate behavior, mental or social problems. Foreign court orders are not automatically recognized. However, Dominican courts may recognize foreign decrees once a specified legal process has been followed.
* * * *
Custody orders and judgments of foreign courts are not automatically enforced in the Dominican Republic. They are enforced with the help of the Departmento de Familia y Menores of the Dominican Attorney General's Office.
* * * *
In cases where one parent has been granted custody of a child, the other parent is usually granted visitation rights. The American Embassy in Santo Domingo has reported few problems for non-custodial parents exercising their visitation rights. If a custodial parent fails to allow visitation, the non-custodial parent may appeal to the court.
Plaintiff also submitted a sworn statement from his retained attorney in the Dominican Republic, Peguero Diaz Boissard, dated August 18, 2004, stating in pertinent part:
In this matter we have made a Petition to the Court of Santo Domingo for Declining the Audience of [defendant's] Petition and should be moved to the Court of the State of New Jersey in the United States of America, and the same was requested first in New Jersey by [plaintiff], therefore this decision should be definitive. We want to express that [defendant] did not inform to the Courts of the Dominican Republic, that [plaintiff] had started a Petition of Grant of Guard and Care of the Minors. This Petition is done in virtue that in Dominican Republic it is necessary the presence of both parents during all the procedure of Judgment, which could spend years in the same.
In his supporting brief, plaintiff argued that the proceedings initiated by defendant in the Dominican Republic would not lead to an examination of the children's best interests. Therefore, plaintiff urged the Family Part to retain jurisdiction pursuant to N.J.S.A. 2A:34-31a(2).
Defendant submitted a letter from Ulises Cabera, her attorney in the Dominican Republic, stating, inter alia, that the Judge of Children and Adolescents handling the Dominican Republic case had consented to speak with a judge of the Family Part.
The pending applications were then considered by the Family Part in a hearing held on August 20, 2004. By way of preliminary remarks, the judge reviewed the procedural history and stated, in pertinent part:
To bring this matter into some degree of focus, I will tell you what I'm inclined to do and what I'm inclined not to do. I'm inclined not to dismiss this case today. I haven't had an opportunity to speak with Judge Blandino [of the Dominican Republic]. That was my whole purpose. Before I made a decision where we're going to go with this case, I wanted an opportunity to interact with the judge in Santo Domingo. Now I've read the material on the website, so you *223 understand that. I know that Santo Domingo is not a signatory to the Hague Convention, but that does not necessarily immediately dictate the result. I don't necessarily immediately default to a position that the Santo Domingo courts do not have jurisdiction simply because they're not a signatory to the Hague Convention. That is something which I must consider with greater insight than I have right now. It is a fact, though, that Santo Domingo is not a signatory to the Hague Convention. Norway is, which is interesting.
So I am not inclined to dismiss this case and I will not enter an order to that effect summarily today, certainly not until I get the opportunity to interact with the judge in Santo Domingo.
After hearing arguments from counsel, the judge stated he was retaining jurisdiction of the custody issue pursuant to N.J.S.A 2A:34-31a(2), and would speak with the Dominican Republic judge. He ordered overnight parenting time for plaintiff with the children, and scheduled the matters for further argument on August 25, 2004. The judge also denied defendant's application for a stay. Written orders memorializing the court's rulings were issued on August 20, 2004.
On August 20, 2004, defendant applied to this court on an emergent basis seeking summary dismissal of the Family Part action. Plaintiff submitted opposition to defendant's request. Judge Alley of this court considered the matter and rejected defendant's application on August 23, 2004, stating:
The order for which emergent review is sought is interlocutory and therefore does not qualify for emergent relief. Because defendant has not filed a motion for leave to appeal, this Court lacks jurisdiction to grant the requested relief. Moreover, defendant has not shown any irreparable harm that would occur between the present time and the time the trial court issues a further ruling, which is scheduled for August 25, 2004. Accordingly, the application is denied. Counsel is free to file a motion with the Clerk's office. In the event further emergent relief is sought, it would be of assistance if the parties were to file with their applications verbatim transcripts containing the trial court's factual findings and conclusions of law as set forth on the record.
The hearing in the Family Part resumed on August 25, 2004. The judge placed the following pertinent remarks on the record at the inception of the hearing:
Here the court is confronted by the reality that we are not dealing with competing states in the sense of United States; we are dealing with competing sovereign nations. Under N.J.S.A. 2A:34-51 there is a provision in ... the UCCJA which talks about international application of the statute and it says in pertinent part: "The general policies of this act extend to the international area. The provisions of this act relating to the recognition and enforcement of custody decrees of other states apply to custody decrees and decrees involving legal institutions similar in nature and to custody rendered by appropriate authorities of other nations, if reasonable notice and opportunity to be heard were given to all affected parties."
As I see that statute I think it is broadly intended to allow a trial court such as myself to enter orders recognizing international judgments and decrees. Of course if ... a state were member of the Hague Convention, which is itself is an international treaty in many ways mirroring the concepts of the UCCJA but on an international level, there *224 would be a far easier decision for this court to make in this matter.
The court would also have to look, and I have looked to a certain extent, to the procedures that are available in the competing state, what is happening or what would likely happen or what procedures would be followed in the competing state, in this case the Dominican Republic.
After much let's say difficulty, three or four attempts, the court was able to speak at length with Antonia Josefina Grullon Blandino, who is the Judge of Children and Adolescents in the Dominican Republic and namely Santo Domingo, who was assigned to this case and she is familiar with this case. I was assisted in the conversation that occurred about 11:30 yesterday New Jersey time, which I believe was similar to Santo Domingo time, and we had a very interesting and I thought enlightening conversation regarding what is happening in the Dominican Republic, what is pending there and the process that would occur in the Dominican Republic regarding the defendant's move to Norway.
I was concerned on three levels and perhaps even more, but three primary levels. One, what is happening in the Dominican Republic at this time beyond the petition that had been previously submitted and apparently there has been a second submission, but I don't believe I have it; I may be wrong.
* * * *
Mr. Cabrera[, defendant's counsel] apparently filed something recently referring to Norway; there's a reference to Norway.
* * * *
The Judge indicated that that is happening, so it's unclear to me exactly what has been filed. However, there has not been a proceeding there, that is in Santo Domingo, to allow the defendant here to remove the children to Norway. According to Judge Grullon Blandino there was a reference to the Norway matter or the ... move to Norway, but not in the context of a ... request by the defendant to be allowed to remove the children to Norway.
I note of course and it's without debate that Dominican Republic is not a signatory to the Hague Convention. What happens essentially in ... the Dominican Republic is specific and governed by its laws. There are no legal constraints on the Dominican Republic to honor the orders of this court nor are there constraints on this court to honor the orders of the Dominican Republic. That raises very interesting questions as to the applicability of the underlying policies of the UCCJA in a case like that.
But to continue the record, apparently [defendant] has filed a petition in the Dominican Republic, in Santo Domingo, asserting that her ex-husband ... has violated the orders of that court and ... she demands of course that the court enforce her parental rights as reflected in the March judgment of divorce, 2003.
Indeed, he is potentially criminally liable under that jurisdiction for violating the orders of that court. That would be analogous to our criminal statute under 2C for interfering with custody. However, we're dealing with a whole different system of justice, a completely different system of justice, one in which the defendant does not likely possess a presumption of innocence. This is a civil system, civil law probably in many respects *225 emanating from the Napoleonic codes and the whole concepts of justice and the presumption of innocence that we hold so sacred here in this country do not apply....
Judge Grullon Blandino was very candid in saying that yes, indeed, he could conceivably be subjected to imprisonment were he to appear in the Dominican Republic on a complaint of violation of the court order entered in that jurisdiction by virtue of his failure to return the children when he was required to do so.
* * * *
Regarding the issue of removal, which would be the third area, we also have a disconnect to a certain extent in the nature of our judicial concepts, that is the concepts that exist here in New Jersey as opposed to those which exist in the Dominican Republic. Now I want it to be clear that I do not in any way, shape or form profess to be an expert in the law of the Dominican Republic. That would be a task which I likely would not ... be able to frankly successfully accomplish as I have very little Spanish proficiency. My conversations with Judge Grullon Blandino were assisted by our court appointed translator. The conversations did take place in Spanish, but I had [an interpreter] assisting me in that process.
But I feel comfortable that in discussing the process of the move to Norway with Judge Grullon Blandino, I did come away... with what I believe is an accurate understanding of that process were it to be instituted in the Dominican Republic. It has not been instituted as far as I know. The judge, Grullon Blandino, indicated to me that is an "administrative thing," that they don't have a hearing per se on such matters, that the parties file papers ordinarily prepared by counsel ... and the judge reviews those papers and makes a decision. The decision is generally, as I said, not ... made through a hearing, she may or may not speak to the children. Judge Grullon Blandino would be the judge who would consider the matter and the ... impression that I got was that at least in terms of structure, in protocol, in the procedure that occurs in the Dominican Republic is vastly different than what would occur here in this State or likely most other State in this area.
Even though when you read Baures v. Lewis [, 167 N.J. 91, 770 A.2d 214 (2001)], which is the case that talks about removal here, there is a very comprehensive discussion of how different states address this issue. There seems to be an underlying commonality that in all states, regardless of the particular standards which may be applied, there is typically a due process hearing where the parties are able to make their points known, ultimately addressed to the best interests of the children.
The devil is always in the detail when it gets to the best interest because there the courts tend to vary in terms of what is in the best interest of the children. Some states believe that they should reside in their home state and never be moved, even though the parent of primary custody or ... joint physical custody wishes to move. New Jersey has come away from that particular point of view and takes a slightly different one. I emphasize slightly because I think it all goes back to the best interests, it's just the perception of what is in the best interests of children. That varies from state to state and what standards one uses to assess best interest.
I come away from my discussion with Judge Grullon Blandino with the belief that there is no comparable proceeding *226 in the Dominican Republic that would serve as an analog, so to speak, to what we would have here in this country. That raises very interesting implications regarding the application of N.J.S.A. 2A:34-51 and whether this court is in someway bound or should honor the decisions of the jurisdiction of the court in the Dominican Republic.
Now, with all of that said and just to see if I can put this thing in some broader function here or category, and I may be wrong, it's not the first time, probably not the last time. The attorneys here really take a very different perspective on this case. Broadly, [plaintiff] takes the view that the court should get to the merits in the best interests of the children and make a decision. Without getting into the details of jurisdiction, he asserts that whether the court goes under subsection two or three doesn't matter, the court should do it because it's in the best interests of the children to do it.
I will say he comes to the court with a dappled or let's say problematic history to a certain extent. He has plusses and minuses on his side of the table.
The defendant on the other hand wishes to focus on jurisdiction and has from the moment this case came to this court focused on jurisdiction, arguing vigorously that the court should not even exercise temporary jurisdiction. Of course, temporary jurisdiction means hold the matter status quo while we sort it out and that's what I've been doing.
The defendant asserts that there is no jurisdiction here. The parties lived, the children lived, the divorce occurred, the significant context arise, witnesses exist, all of that in Santo Domingo. There is no reason for this court to ... continue to exercise jurisdiction stated in a positive way and the defendant's arguments have been articulated very well.
The impression that I got in this case that it is to a certain extent the "War of the Roses." The parties seem to be very much emotional and ... in their relations very much heated. There was difficulty even in getting temporary visitation in the last approximate month while this case was pending. It was filed in the latter waning days of July and first the plaintiff refused to allow the defendant to have visitation and then the defendant refused. I say this not absolutely but there were problems, concerns, inabilities to work things out. This is perceived by the court as an underlying and likely continuing attitude of the parties, which will continue regardless of where this case ultimately goes in terms of litigation, whether it goes to Santo Domingo, Dominican Republic, or remains here in New Jersey or indeed goes to Norway eventually.
Following those introductory remarks, the judge heard the arguments of counsel, and rendered the following decision, in pertinent part:
This case gives rise to an extremely difficult decision by the court. There are certain realities. The realities are as follows:
One, the parties are United States citizens. They're all born in the United States, they possess no other citizenship. However, they have shall we say been internationalized, they have obviously lived for many years while they were married in the Dominican Republic. Indeed, their youngest son Fredrick was less than three or four months old when he was taken by the couple to the Dominican Republic where they have lived until the time of their divorce or certainly shortly before then.

*227 There was a divorce in the Dominican Republic. The divorce decree was a part of the papers here, it's part of the record, reflects proceedings that occurred in March 2003. While there is some disconnect in the analog between what we would have here in New Jersey in terms of custody versus what occurred there in terms of custody, much of what was done in that ... judgment reflects concepts of joint legal custody. Certainly, [plaintiff] was not shutout from the lives of his children. He has extensive visitation with them for the summer and ... through the certain holidays and there's also involvement in the substantive aspects of the children's lives. He has been an involved father with them; there's nothing in the record that would indicate he has not been an involved father.
* * * *
The evidence as I said before the court was contradictory at least initially on allegations of abuse and neglect, but I found, and I repeat those findings here, that there is no evidence that this court can legitimately rely on that the children have been neglected in the Dominican Republic. There were, of course, issues. Nicole had some issues, more so than Fredrick, but those issues I think perhaps have been accelerated by conduct by the plaintiff since he had the children this summer. The children were, for example, enrolled in counseling with a therapist from Brooklyn, very odd but never explained, and he has taken affirmative actions to  and these were mostly unilateral this summer, almost in preparation for filing this proceeding.
That conduct I would say certainly is a negative on his side of the ledger. It's not to his credit that this happened. The timing of his application is quite dubious.
On the other hand, it is quite clear that the defendant seeks to relocate to Norway. Now she says she will put that on hold if that means she will not be with her children because her children are her whole life. She says this, and to be critical,... her words to a certain extent are empty because I believe the children do possess  both of them, a serious and legitimate anxiety about going to Norway. It is odd in many respects. They were raised in Santo Domingo, which of course is a Hispanic environment primarily, they were immersed in the culture of that country having of course received a substantial education, liberal I would assume education. Certainly they speak flawless English. It's remarkable how they can go from language to language with no at least accent apparent in English. But they are both concerned and the defendant now acknowledges that. But when there was no litigation pending, ... she was very willing to put those children on a plane and just remove them to Norway and that would have occurred but for the intervention of this court and of course plaintiff's application.
* * * *
Now the defendant says since the litigation she's changed her mind and she will not move to Norway until the children are ready. I applaud her views, I think they are appropriate, but they certainly did not exist before this lawsuit was filed.
* * * *
Looking at the statute I have some fundamental precedent and conditional factors to consider. First, does this statute even apply in this case? Certainly *228 the [UCCJA] was designed to alleviate jurisdictional custody disputes. Its purpose is to avoid forum shopping in interstate custody conflicts and to foster cooperation among the states. The act is designed to grant custody jurisdiction to the state with the more significant ... contacts and to assist the ... state's order with enforceability in the state competing for jurisdiction. It is an extremely worthy and appropriate policy. Judges are to communicate with one another in such states.
As I understand it all fifty states ... have adopted this statute and it has become a common tool in dealing with interstate jurisdictional issues involving child custody.
As I said earlier, the statute itself envisions international application, [N.J.S.A.] 2A:34-51. I interpret this statute to be analogous. This particular subsection, 51, to be an analog of our system here within the United States. At least to the extent if reasonable notice and opportunity to be heard, what does that mean under our system of justice, "reasonable notice and opportunity to be heard," what does that mean, fundamental due process?
Now I do not want to get into a debate ... of comparative law as to what this means from a civil or the English system. We operate under an English system; Santo Domingo operates under an Napoleonic system. Its concepts vary greatly from our concepts. I have no evidence here which would suggest that in Santo Domingo these children or their removal to Norway would receive any kind of judicial scrutiny in any way, shape or form analogous, similar or comporting with this court's concept of due process in that sense. Indeed, I have indications to the contrary.
With that said, where does this court have the jurisdiction to proceed even though this court has concerns about what would occur in Dominican Republic? As I said, the "administrative proceeding" in the Dominican Republic, I suspect, is more of a rubberstamp, although I don't want to be misquoted on that. I have no reason to disrespect Judge Grullon Blandino in any way, shape or form. However, the process that she described to me was hardly equivalent to that which would occur typically in a signatory to the UCCJA.
I also wish to note that the Dominican Republic is not a signatory to the Hague Convention and there is no legal mandate on that court to view any ruling by this court as binding on it in any respect or vice-versa.
Emotions have run high in this case. I have no doubt that it is foreseeable that if [plaintiff] appeared in Santo Domingo he could easily be arrested, imprisoned and kept without bail perhaps for at least a time. That's hardly an environment conducive to the litigation of the best interests of the children in that forum.
The defendant has filed proceedings in the Dominican Republic, they're a part of this record, but they ... at this point seek no permission to remove to Norway. I have a sparse record in that regard.
* * * *
The problematic jurisdiction and the only basis that this court could potentially assert jurisdiction resides in [N.J.S.A. 2A:34-31a(2)], which says as follows: "It is in the best interest of the child that a court of this State assume jurisdiction because (i) the child and his parents, or the child and at least one contestant, have a significant connection *229 with this State, and (ii) there is available in this State substantial evidence concerning the child's present or future care, protection, training and personal relationships[.]"
I am going to exercise jurisdiction here. I'm going to find that this statute does allow the court to exercise jurisdiction in the best interest of the children. I do so on the following grounds and based upon these findings:
The children are in fact United States citizens. The parties are United States citizens. There is no state greater than New Jersey in the United States to exercise the jurisdiction. Were the matter solely revolving about their continued residence in Dominican Republic I might have a different view of it, but the defendant has indicated by her conduct certainly and certainly by her statements here that there is a substantial and continued desire on her part eventually to move to the... country of Norway. Dominican Republic will evaporate; its interests over this matter have passed. The children were not going to be enrolled in the school. I find in fact that they were dis-enrolled; they were recently re-enrolled. The enrollment, removal and re-enrollment reflects that the defendant never had an intention of enrolling the children in the school in Santo Domingo for the fall term. That serves as a further ground for this court to conclude that she never intended the children to return to Santo Domingo; they were going to get on a plane and go to Norway. The children have indicated to me, the parties have indicated that to me; I don't think there's any doubt about it.
Since the case has been filed, of course the defendant has taken a different view of it. She says, well I'll defer, I'll hold off, I will do whatever's necessary to bring my children to understand that this move to Norway is not going to be threatening, damaging to them and they will be able to, shall we say, be appropriately guided in this move. She has every right ultimately of course to move on with her life, that's not the point. The point is, how can this move and what way can the ... plaintiff effectively challenge it as the biological father of these children. But here in New Jersey he would have that right. He may not prevail, but he would have that right. He would have the right to offer evidence, he would have the right to argue that it's not in the best interests of the children, he would have that right. It's the fundamental right of every citizen to have access to court and judicial proceedings in which due process of law would be upheld in our concepts, that is the concepts of the United States, and I don't mean to be critical of any other country or any other system. Every country and every system reflects their own values, their own system, their own history, their heritage. We respect that, but we have to deal here with competing interests.
I am convinced that that which would occur in the Dominican Republic would be far, far short of what would be necessary in a proceeding here in the United States. The administrative proceeding that Judge Grullon Blandino suggested in our telephone conference is a shadow of what would occur here. We would... look at this situation certainly far differently than the courts in the Dominican Republic would look at it and this is a ... vexatious issue and our courts have always held that the best interests of the children predominate. And so we go to the best interests, which seems to me to be the final trump in this particular procedure.

*230 Best interests, what are the best interests of the children? Certainly they have concerns about moving to Norway, everybody agrees to that and I find that [N.J.S.A. 2A:34-31a(2)] allows this court in the best interests of the children to retain the jurisdiction, to direct that a hearing occur here in New Jersey within 45 days as to whether it's in the interest of the children that they be allowed to relocate with their mother to Norway, assuming she still wishes to do that and I assume she does.
In the meantime, the parties shall have joint legal custody of the children. They shall have joint physical custody of the children. He will have the children on Mondays and Tuesdays, she'll have the children on [Wednesdays], Thursdays and Fridays and they'll alternate weekends. The children will for the time being be enrolled in the East Hanover School District. School starts very quickly. The parties shall refrain from disparaging each other in the presence of the children. They shall work out  of course if they wish to modify this schedule they will have every right to do so, but they shall do so of course in a non-harassing, non-abusive way.
* * * *
The parties all  should know that this is going to be on a fast track. I don't know whether they want any further custody evaluation to proceed and of course my ruling may very well end up being reversed by the Appellate Division if [defendant] takes an appeal and it's certainly [her] right to do so. But we're moving this case forward and it remains here in New Jersey as far as I'm concerned for the time being.
* * * *
The children will not be removed from New Jersey except by order of the court and the ... children's passports will be retained as per prior order....
An order memorializing the court's decision was entered on August 26, 2004, assuming jurisdiction over the custody and relocation of the children pursuant to N.J.S.A. 2A:34-31a(2); scheduling a plenary hearing on plaintiff's request for modification of custody and defendant's intended relocation to Norway within forty-five days; establishing a joint legal and joint physical custodial and parenting-time relationship between the parties pending the results of the hearing; directing that the children be enrolled in the East Hanover public schools pending further order; requiring both parties to cooperate with all experts retained on the custody and removal issues; prohibiting the parties from disparaging each other in the presence of the children; prohibiting removal of the children from New Jersey; and requiring plaintiff to retain possession of the children's passports. Defendant's application for a stay of the August 26th order was denied.
On August 26, 2004, defendant presented an application for emergent relief to Judge Alley of this court; plaintiff filed opposition. On August 30, 2004, Judge Alley issued an order rejecting the application for emergent relief, and stating:
We do not minimize the importance to the parties of the best interests of the children, including with respect to educational matters. We recognize that the trial court's continued assertion, until its further order, of jurisdiction in New Jersey under N.J.S.A. 2A:34-31a(2), may result in inconvenience to the parties and that the greater burden thereof may fall, at least initially, on defendant. Simply put, however, and in light of the trial court's August 26, 2004 ruling and the court's reasons for decision expressed *231 on the record, the application does not seek relief which is emergent. We also note the findings of the trial judge as to the lack of substantial equivalence of the procedures for treatment accorded to custody matters by the respective judicial systems of New Jersey and of the Dominican Republic.
This is without prejudice to defendant, on a timely and non-emergent basis, pursuing leave to appeal if the trial court's order is interlocutory, or filing a notice of appeal if such order is deemed final, an issue we do not decide herein, and to apply for an accelerated briefing schedule therein.
On or about September 1, 2004, defendant filed a motion in the Supreme Court requesting emergent relief from the order of the Family Part entered on August 26, 2004, granting leave to appeal therefrom, and seeking an order finding that the exercise of continuing jurisdiction by the Family Part is improper and requiring dismissal of plaintiff's custody action.
On September 8, 2004, the Supreme Court issued an order granting defendant's motion for leave to appeal and stated that "the matter is summarily remanded to the Appellate Division to consider on an accelerated basis the question of whether jurisdiction is proper in New Jersey." By notice dated September 13, 2004, the office of the Clerk of the Appellate Division directed the filing of supplemental briefs and scheduled the matter for argument on October 14, 2004.
On appeal, defendant presents the following arguments for our consideration:
POINT I
THE TRIAL COURT'S ASSERTION OF CONTINUING JURISDICTION IN THE BEST INTERESTS OF THE CHILDREN AFTER IT DETERMINED THAT IT NO LONGER HAD EMERGENT JURISDICTION UNDER THE U.C.C.J.A. WAS IMPROPER.
POINT II
THE STATUS OF A COUNTRY AS A NON-HAGUE CONVENTION SIGNATORY IS NOT DISPOSITIVE RESPECTING JURISDICTIONAL DISPUTES.
POINT III
SINCE THE SUPERIOR COURT OF NEW JERSEY HAS NOT PROPERLY ASSERTED SUBJECT MATTER JURISDICTION PLAINTIFF CAN NOT CHALLENGE THE INITIAL CUSTODY DESIGNATION UNDER THE DOMINICAN REPUBLIC JUDGMENT OF DIVORCE IN THE SUPERIOR COURT OF NEW JERSEY.
Resolution of the issues presented in this appeal requires analysis and application of the provisions of the UCCJA, which presently governs the determination of subject-matter jurisdiction of the Family Part in interstate, as well as international, custody disputes. See Ivaldi v. Ivaldi, 147 N.J. 190, 198, 685 A.2d 1319 (1996) (ruling that the UCCJA, read as a whole, applies to foreign countries as if they were states).
We are also mindful that the UCCJA has been repealed by L. 2004, c. 147, enacted September 14, 2004, effective as of December 12, 2004. That enactment replaces the UCCJA with the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA), codified as N.J.S.A. 2A:34-53 to -95.
N.J.S.A. 2A:34-31a is the jurisdictional provision of New Jersey's version of the UCCJA. That section confers jurisdiction on the Superior Court to make an initial child-custody determination or modification of an existing custodial decree where:
(1) This State (i) is the home state of the child at the time of commencement *232 of the proceeding, or (ii) had been the child's home state within 6 months before commencement of the proceeding and the child is absent from this State because of his removal or retention by a person claiming his custody or for other reasons, and a parent or person acting as parent continues to live in this State; or
(2) It is in the best interest of the child that a court of this State assume jurisdiction because (i) the child and his parents, or the child and at least one contestant, have a significant connection with this State, and (ii) there is available in this State substantial evidence concerning the child's present or future care, protection, training, and personal relationships; or
(3) The child is physically present in this State and (i) the child has been abandoned or (ii) it is necessary in an emergency to protect the child because he has been subjected to or threatened with mistreatment or abuse or is otherwise neglected; or
(4)(i) It appears that no other state would have jurisdiction under prerequisites substantially in accordance with paragraphs (1), (2), or (3), or another state has declined to exercise jurisdiction on the ground that this State is the more appropriate forum to determine the custody of the child, and (ii) it is in the best interest of the child that this court assume jurisdiction.
Accordingly, N.J.S.A. 2A:34-31a confers jurisdiction upon the Family Part to hear custody matters in the following four circumstances, measured as of the date the complaint or application for modification of custody is made: (1) where New Jersey is the "home state" of the children; (2) where it is in the "best interests" of the children that New Jersey assume jurisdiction because the children and at least one parent have a "significant connection" with New Jersey and there is available in New Jersey "substantial evidence" bearing upon the children's present or future care, protection, training and personal relationships; (3) where the children are present in New Jersey and either the children have been abandoned or there is an "emergency" requiring action by the court to protect the children because they have been subjected to or threatened with mistreatment or abuse or are otherwise neglected; or (4) "default jurisdiction," where no other state would have jurisdiction under the criteria set forth in (1), (2) or (3) above, or another state "has declined" to exercise jurisdiction because New Jersey is the more appropriate forum, and it is in the "best interests" of the children that New Jersey assume jurisdiction.
After analyzing the record and in light of the written and oral arguments advanced by the parties, we agree with the analysis of the trial court that New Jersey lacks authority to assume either home state jurisdiction, N.J.S.A. 2A:34-31a(1); emergency jurisdiction, N.J.S.A. 2A:34-31a(3); or default jurisdiction, N.J.S.A. 2A:34-31a(4), over custody issues pertaining to the parties' children. Therefore, the only bona fide issue presented in this appeal is whether  under the unique circumstances of this case  the Family Part had the authority to assume custody jurisdiction under the so-called significant connection/substantial evidence/best interests criteria set forth in N.J.S.A. 2A:34-31a(2).
Before analyzing whether the jurisdictional prerequisites of that provision have been satisfied, it is informative to note some discreet differences between the UCCJA and the UCCJEA, which becomes effective in New Jersey on December 12, 2004. Those differences provide an extrinsic aid in our consideration of the issue of *233 whether the Family Part properly assumed custody jurisdiction pursuant to N.J.S.A. 2A:34-31a(2).
The overriding goal in applying a statute is to determine the Legislature's intent. Brodsky v. Grinnell Haulers, Inc., 181 N.J. 102, 109, 853 A.2d 940 (2004). New laws that radically change or clarify the old may be the basis of, and may provide some indication of, legislative intent of the applicable statute. New Jersey State Policemen's Benevolent Ass'n of N.J., Inc. v. Town of Morristown, 65 N.J. 160, 165, 320 A.2d 465 (1974). Indeed, although a superseding statutory enactment is not yet effective, the legislative policy and intent of the new statute may inform interpretation and application of the existing version of the statute. In re Adoption of a Child by P.S., 315 N.J.Super. 91, 114-15, 716 A.2d 1171 (App.Div.1998). See also Boyd v. Marini, 132 N.J.Super. 324, 328, 333 A.2d 559 (App.Div.1975) (noting that subsequent legislative advice may be acceptable as a convincing extrinsic aid to an interpretation of an earlier law); 2B Norman J. Singer, Sutherland on Statutory Construction § 49.11 (6th ed.2002) (noting that where a doubtful meaning of a former statute is rendered certain by subsequent legislation, such subsequent legislation is strong evidence of legislative intent with respect to the first statute).
We begin our analysis of the jurisdictional issue posited with reciting the laudable purposes of the UCCJA:
The Legislature finds that this act is necessary in order to:
a. Avoid jurisdictional competition and conflict with courts of other states in matters of child custody which have in the past resulted in the shifting of children from state to state with harmful effects on their well-being;
b. Promote cooperation with the courts of other states to the end that a custody decree is rendered in that state which can best decide the case in the interests of the child;
c. Assure that litigation concerning the custody of a child takes place ordinarily in the state with which the child and his [or her] family have the closest connection and where significant evidence concerning his care, protection, training, and personal relationships is most readily available, and that courts of this State decline the exercise of jurisdiction when the child and his family have a closer connection with another state;
d. Discourage continuing controversies over child custody in the interest of greater stability of home environment and of secure family relationships for the child;
e. Deter abductions and other unilateral removals of children undertaken to obtain custody awards;
f. Avoid relitigation of custody decisions of other states in this State insofar as feasible;
g. Facilitate the enforcement of custody decrees of other states; and
h. Promote and expand the exchange of information and other forms of mutual assistance between the courts of this State and those of other states concerned with the same child.
[N.J.S.A. 2A:34-29.]
In ruling that the UCCJA applies to foreign countries as if they were states, the Court noted "[t]hat conclusion comports with the central policy of the Act's jurisdictional provisions, which is to assure that custody litigation occurs in the place where the child and his or her family have the closest connection." Ivaldi, supra, 147 N.J. at 198, 685 A.2d 1319.
*234 The four jurisdictional prerequisites set forth in the UCCJA, here in N.J.S.A. 2A:34-31a, are applicable to a custodial applications seeking both an "initial" order or an order "modifying" an existing custody order. However, with respect to custody-modification applications, the UCCJA specifically provides:
a. If a court of another state has made a custody decree, a court of this State shall not modify that decree unless (1) it appears to the court of this State that the court which rendered the decree does not now have jurisdiction under jurisdictional prerequisites substantially in accordance with this act or has declined to assume jurisdiction to modify the decree, and (2) the court of this State has jurisdiction.
[N.J.S.A. 2A:34-42a (emphasis added).]
Thus, N.J.S.A. 2A:34-31a and N.J.S.A. 2A:34-42a, when read together, make clear that when faced with an application to modify the custody order of another state, here a foreign country, the Family Part must first determine whether the state/country that issued the order to which modification is sought has "jurisdiction under jurisdictional prerequisites substantially in accordance with this act or has declined to assume jurisdiction to modify the decree[.]" Here, although the final judgment issued by the Dominican Republic court specifically permitted him to do so, plaintiff has not filed an application in the Dominican Republic to modify the custodial award embodied in the divorce judgment issued by that country or to prevent defendant from relocating with the children to Norway. Rather, at the prompting of the Family Part, defendant filed an application in the courts of the Dominican Republic to enforce her custodial rights.
The term "home state" under the UCCJA is defined in N.J.S.A. 2A:34-30e as
the state in which the child immediately preceding the time involved lived with his parents, a parent, or a person acting as a parent, for at least 6 consecutive months, and in the case of a child less than 6 months old the state in which the child lived from birth with any of the persons mentioned. Periods of temporary absence of any of the named persons are counted as part of the 6-month or other period[.]
The definition of "home state" under the UCCJEA, N.J.S.A. 2A:34-54, is substantially the same, stating:
"Home state" means the state in which a child lived with a parent or a person acting as a parent for at least six consecutive months immediately before the commencement of a child custody proceeding. In the case of a child less than six months of age, the term means the state in which the child lived from birth with any of the persons mentioned. A period of temporary absence of any of the mentioned persons is part of the period.
Here, that the courts of the Dominican Republic continue to have jurisdiction over the modification of its custodial order "under jurisdictional prerequisites substantially in accordance with" the UCCJA, N.J.S.A. 2A:34-42a, seems clear. "The first element of compliance with the UCCJA is for the issuing court to have subject-matter jurisdiction." Ganz v. Rust, 299 N.J.Super. 324, 337, 690 A.2d 1113 (App.Div.1997). Under any analysis of the facts of this case, the Dominican Republic is the "home state" of these children and the courts of that country certainly have subject-matter jurisdiction to entertain applications directed to issues of custody of the children. Moreover, the overwhelming evidence in the record establishes that the children and defendant have a significant connection with the Dominican *235 Republic, where they have lived continuously since 1995, and that there is available substantial evidence concerning the children's present or future care, protection, training, and personal relationships in the Dominican Republic.[2] Therefore, plaintiff has not satisfied the first prong contained in N.J.S.A. 2A:34-42a(1) for the exercise of subject-matter jurisdiction to modify the custodial arrangement decreed by the courts of the Dominican Republic some sixteen months prior to his filing for custody in the Family Part. Assuming that plaintiff had established the first prong, he would still be required to establish the second prong for modification jurisdiction, namely, that "the court of this State has jurisdiction." N.J.S.A. 2A:34-42a(2).
However, when an international custody dispute arises, the first issue to be analyzed is whether the jurisdictional provisions of the UCCJA should be applied at all. That issue revolves around the question of whether a parent is accorded due process in the foreign country, including reasonable notice and an opportunity to be heard. N.J.S.A. 2A:34-51, entitled "International application," provides as follows:
The general policies of this act extend to the international area. The provisions of this act relating to the recognition and enforcement of custody decrees of other states apply to custody decrees and decrees involving legal institutions similar in nature and to custody rendered by appropriate authorities of other nations, if reasonable notice and opportunity to be heard were given to all affected persons.

[Emphasis added.]
This section extends all the general policies of the UCCJA "to the international area." Ivaldi, supra, 147 N.J. at 200, 685 A.2d 1319. It also "requires New Jersey courts to recognize foreign custody decrees issued by similar `legal institutions' in the same manner as the courts would recognize decrees of other states, provided those institutions have accorded affected persons notice and the opportunity to be heard." Ibid. (emphasis added). In commenting on the qualifying language contained in N.J.S.A. 2A:34-51, the Court noted:
The statutory language reflects the Legislature's uncertainty about the nature of foreign legal institutions. It counsels courts to verify that those institutions have proceeded in a manner consistent with the requirements of fundamental due process. Subject to those qualifications, the statute recognizes that the Act applies to international child-custody disputes.
Judicial recognition of foreign custody decrees comports with the reality that nations are drawing closer together. Information, capital, and goods daily cross international boundaries. People likewise travel regularly from country to country. National boundaries no longer prevent people from meeting or marrying. Sometimes those marriages will end in divorce and custody disputes. International child-custody actions have become part of a global society.
With increasing frequency, state courts may confront custody disputes arising from families comprised of citizens of different countries. When resolving those disputes, a court may harbor doubts about the law of another country, particularly when that country's legal system, culture, religion, and language *236 differ from ours. Notwithstanding those doubts, the courts of another country may provide a more convenient forum for determining custody.
Through N.J.S.A. 2A:34-51, the Legislature has extended the Act's policies to the determination of jurisdictional questions in international custody cases. Those policies include the importance of the identification of the "home state" and the need to avoid jurisdictional conflicts.

[Id. at 200-01, 685 A.2d 1319 (emphasis added).]
As noted by the Court in Ivaldi, supra, 147 N.J. at 202-03, 685 A.2d 1319, the "International application" provision contained in the UCCJEA is similar, but more specific, and provides:
a. A court of this State shall treat a foreign country as if it were a state of the United States for the purposes of applying articles 1 [General Provisions] and 2 [Jurisdiction] of this act if the foreign court gives notice and an opportunity to be heard to all parties before making child custody determinations.

b. A child custody determination made in a foreign country under factual circumstances in substantial conformity with the jurisdictional standards of this act shall be recognized and enforced under article 3 [Enforcement] of this act.
c. A court of this State need not apply this act if the child custody law of a foreign country violates fundamental principles of human rights or does not base custody decisions on evaluation of the best interests of the child.

[N.J.S.A. 2A:34-57 (emphasis added).]
The official comment of the National Conference of Commissioners on Uniform State Law to this section of the UCCJEA provides, in pertinent part:
A court of this State may refuse to apply this Act when the child custody law of the other country violates basic principles relating to the protection of human rights and fundamental freedoms. The same concept is found in ... Section 20 of the Hague Convention on the Civil Aspects of International Child Abduction ... [.] In applying [N.J.S.A. 2A:34-57c], the court's scrutiny should be on the child custody law of the foreign country and not on other aspects of the other legal system. This Act takes no position on what laws relating to child custody would violate fundamental freedoms. While the provision is a traditional one in international agreements, it is invoked only in the most egregious cases.

[9 U.L.A. 662, Comment to § 105 (emphasis added).]
Here, the record does not reflect that plaintiff's fundamental due process rights had been violated when the Dominican Republic issued the custodial order embodied by the March 24, 2003 judgment of divorce. In fact, the record on appeal discloses quite the opposite. Plaintiff was given reasonable notice of the Dominican Republic divorce action, was afforded a full opportunity to be heard, was represented by counsel of his choosing in that proceeding, negotiated and entered into a property settlement agreement that resolved, inter alia, the custodial and parenting-time issues, and he consented to the continuation of custody jurisdiction in the Dominican Republic. The Dominican Republic divorce decree provides plaintiff with a liberal and reasonable parenting-time schedule that has been fully adhered to by defendant. Moreover, plaintiff has failed to establish that the courts of the Dominican Republic would violate principles of human rights or not resolve any custody modification application based on *237 an evaluation of the best interests of the children.
The circumstances in which plaintiff now finds himself, namely, subject to a custody-enforcement proceeding in the Dominican Republic that may have criminal consequences is unfortunate. However, those circumstances were created by his filing of a custody complaint in the Family Part, the linchpin of which was the assertion of emergency jurisdiction pursuant to N.J.S.A. 2A:34-31a(3) founded upon baseless allegations that the children had "been subjected to or threatened with mistreatment or abuse or [were] otherwise neglected." It should also be noted that the enforcement mechanisms invoked in the Dominican Republic are analogous and substantially similar to those readily available in New Jersey pursuant to R. 1:10-3 or through application of N.J.S.A. 2C:13-4.
The Family Part judge properly assumed temporary jurisdiction under those allegations to assure the safety and protection of the children. However, as the judge proceeded, it was clear from the evidence, consisting of Dr. Montgomery's expert investigation and analysis as well as the considerable documentation supplied by defendant, that the claim of an "emergency" was without merit.
When the issue of emergency jurisdiction is removed from the jurisdictional calculus, the Family Part was essentially presented with the issue of whether defendant's planned move to Norway with the children constituted a sufficient basis for assumption of subject-matter custody modification jurisdiction by New Jersey. The detailed list provided to the Family Part by plaintiff of "significant connections" and "substantial-evidence," when viewed as of July 27, 2004  the date of the filing of the custody complaint in the Family Part  were insufficient to invoke subject-matter jurisdiction to modify the Dominican Republic custodial decree, unless that decree should not be enforced at all under the criteria set forth in N.J.S.A. 2A:34-51, or that contained in the recently-enacted UCCJEA provision, N.J.S.A. 2A:34-57. Moreover, the modification-jurisdiction criteria outlined in N.J.S.A. 2A:34-42a clearly was not met. Namely, it cannot be concluded that the Dominican Republic "court which rendered the decree [sought to be modified] does not now have jurisdiction under jurisdictional prerequisites substantially in accordance with" the UCCJA.
It is also instructive to analyze this case under the provisions of the UCCJEA, as enacted in New Jersey. The UCCJEA separates the child custody jurisdictional prerequisites into those governing "an initial child custody determination," N.J.S.A. 2A:34-65; those governing "jurisdiction to modify" an existing custody determination of another state, N.J.S.A. 2A:34-67; and those governing "temporary emergency" circumstances, N.J.S.A. 2A:34-68. It also adopts the concept of "exclusive, continuing jurisdiction," N.J.S.A. 2A:34-66, which provides:
a. Except as otherwise provided in [N.J.S.A. 2A:34-68 ("emergency" custody jurisdiction)], a court of this State that has made a child custody determination consistent with [N.J.S.A. 2A:34-65 ("initial" custody jurisdiction)] or [N.J.S.A. 2A:34-67 ("modification" custody jurisdiction)] has exclusive, continuing jurisdiction over the determination until:
(1) a court of this State determines that neither the child, the child and one parent, nor the child and a person acting as a parent have a significant connection with this State and that substantial evidence is no longer available in this State concerning the *238 child's care, protection, training, and personal relationships; or
(2) a court of this State or a court of another state determines that neither the child, nor a parent, nor a person acting as a parent presently resides in this State.
b. A court of this State which has made a child custody determination and does not have exclusive, continuing jurisdiction under this section may modify that determination only if it has jurisdiction to make an initial determination under [N.J.S.A. 2A:34-65].
As noted, the UCCJEA also provides for its international application. See N.J.S.A. 2A:34-57.
As to "initial" custody jurisdiction, N.J.S.A. 2A:34-65a provides that the Family Part
has jurisdiction to make an initial child custody determination only if:
(1) this State is the home state of the child on the date of commencement of the proceeding, or was the home state of the child within six months before the commencement of the proceeding and the child is absent from this State but a parent or person acting as a parent continues to live in this State;
(2) a court of another State does not have jurisdiction under paragraph (1) of this subsection, or a court of the home state of the child has declined to exercise jurisdiction on the ground that this State is the more appropriate forum under [N.J.S.A. 2A:34-71 (inconvenient forum)] or [N.J.S.A. 2A:34-72 (jurisdiction declined by reason of conduct)] and

(a) the child and the child's parent, or the child and at least one parent or a person acting as a parent have a significant connection with this State other than mere physical presence; and

(b) substantial evidence is available in this State concerning the child's care, protection, training and personal relationships;
(3) all courts having jurisdiction under paragraph (1) or (2) of this subsection have declined to exercise jurisdiction on the ground that a court of this State is the more appropriate forum to determine the custody of the child under [N.J.S.A. 2A:34-71] or [N.J.S.A. 2A:34-72].; or
(4) no state would have jurisdiction under paragraph (1), (2) or (3) of this subsection.
[Emphasis added.]
N.J.S.A. 2A:34-67 of the UCCJEA, entitled "Jurisdiction to modify determination" provides:
Except as otherwise provided in [N.J.S.A. 2A:34-68], a court of this State may not modify a child custody determination made by a court of another state unless a court of this State has jurisdiction to make an initial determination under [N.J.S.A. 2A:34-65a(1) or -65a(2)] of this act and:

a. the court of the other state determines it no longer has exclusive, continuing jurisdiction under [N.J.S.A. 2A:34-66] or that a court of this State would be a more convenient forum under [N.J.S.A. 2A:34-71]; or
b. a court of this State or a court of the other state determines that the child, the child's parents, and any person acting as a parent do not presently reside in the other state.
[Emphasis added.]
Thus, under the UCCJEA, the Family Part has no jurisdiction to modify the custody order of another state unless New Jersey is the home state of the child, N.J.S.A. 2A:34-65a(1), or a court of another state does not have home-state jurisdiction, *239 or a court of the child's home state has declined to exercise jurisdiction on the ground that New Jersey is the more appropriate forum under N.J.S.A. 2A:34-71 or N.J.S.A. 2A:34-72, and the child and the child's parents, or the child and at least one parent have a "significant connection" with New Jersey other than mere physical presence, and"substantial evidence" is available in New Jersey concerning the child's care, protection, training and personal relationships. Stated differently, under the UCCJEA, a court determining jurisdiction does not reach the "significant connection" and "substantial evidence" tests unless the court of the other state does not have home-state jurisdiction or  having home-state jurisdiction  has declined to exercise custody jurisdiction because it has determined that New Jersey is the more appropriate forum. Here, those prerequisites to the assertion of custody-modification jurisdiction have not been established.
We also note that under the UCCJEA, the issue of "temporary emergency" jurisdiction is dealt with separately from either "initial" or "modification" jurisdiction, as follows:
a. A court of this State has temporary emergency jurisdiction if the child is present in this State and the child has been abandoned or it is necessary in an emergency to protect the child because the child, or a sibling or parent of the child, is subjected to or threatened with mistreatment or abuse.
b. If there is no previous child custody determination that is entitled to be enforced under this act, and if no child custody proceeding has been commenced in a court of a state having jurisdiction under [N.J.S.A. 2A:34-65 to -67], a child custody determination made under this section remains in effect until an order is obtained from a court of a state having jurisdiction under [N.J.S.A. 2A:34-65 (initial jurisdiction), N.J.S.A. 2A:34-66 (exclusive, continuing jurisdiction), or N.J.S.A. 2A:34-67 (modification jurisdiction)]. If a child custody proceeding has not been or is not commenced in a court of a state having jurisdiction under [N.J.S.A. 2A:34-65 to -67], a child custody determination made under this section becomes a final determination if:
(1) it so provides; and
(2) this State becomes the home state of the child.
c. If there is a previous child custody determination that is entitled to be enforced under this act, or a child custody proceeding has been commenced in a court of a state having jurisdiction under [N.J.S.A. 2A:34-65 to -67], any order issued by a court of this State under this section must specify in the order a period of time which the court considers adequate to allow the person seeking an order to obtain an order from the state having jurisdiction under [N.J.S.A. 2A:34-65 to -67]. The order issued in this State remains in effect until an order is obtained from the other state within the period specified or the period expires.
d. A court of this State which has been asked to make a child custody determination under this section, upon being informed that a child custody proceeding has been commenced in, or a child custody determination has been made, by a court of a state having jurisdiction under [N.J.S.A. 2A:34-65 to -67], shall immediately communicate with the other court. A court of this State which is exercising jurisdiction pursuant to [N.J.S.A. 2A:34-65 to -67], upon being informed that a child custody proceeding has been commenced in, or a child custody determination has been made by, a court of another *240 state under a statute similar to this section shall immediately communicate with the court of that state to resolve the emergency, protect the safety of the parties and the child, and determine a period for the duration of the temporary order.
[N.J.S.A. 2A:34-68; emphasis added.]
The UCCJEA was prepared by the National Conference of Commissioners on Uniform State Laws in 1997 to supersede the UCCJA. 9 U.L.A. 649 (1999). Presently, forty-five states, the District of Columbia and the United States Virgin Islands have either adopted or introduced legislation repealing the UCCJA and adopting the provisions of the UCCJEA. "Uniform Child Custody Jurisdiction & Enforcement Act," The National Conference of Commissioners on Uniform State Laws (Nov. 20, 2004), http://www.nccusl.org/nccusl /uniformact_ factsheets/uniformacts-fs-uccjea.asp. In their official comments, the Commissioners explained the purposes of the UCCJEA, in pertinent part, as follows:
This Act ... revisits the problem of the interstate child almost thirty years after the Conference promulgated the [UCCJA]. The UCCJEA accomplishes two major purposes.
First, it revises the law on child custody jurisdiction in light of federal enactments and almost thirty years of inconsistent case law. Article 2 of this Act provides clearer standards for which States can exercise original jurisdiction over a child custody determination. It also, for the first time, enunciates a standard of continuing jurisdiction and clarifies modification jurisdiction. Other aspects of this article harmonize the law on simultaneous proceedings, clean hands, and forum non conveniens.
Second, this Act provides in Article 3 for a remedial process to enforce interstate child custody and visitation determinations. In doing so, it brings a uniform procedure to the law of interstate enforcement that is currently producing inconsistent results....
* * * *
[A]lmost thirty years of litigation since the promulgation of the UCCJA produced substantial inconsistency in interpretation by state courts. As a result, the goals of the UCCJA were rendered unobtainable in many cases.
* * * *
The revisions of the jurisdictional aspects of the UCCJA eliminate the inconsistent state interpretations and can be summarized as follows:
1. Home state priority. The PKPA[, Parental Kidnapping Prevention Act, 28 U.S.C. § 1738A,] prioritizes "home state" jurisdiction by requiring that full faith and credit cannot be given to a child custody determination by a State that exercises initial jurisdiction as a "significant connection state" when there is a "home State." Initial custody determinations based on "significant connections" are not entitled to PKPA enforcement unless there is no home State. The UCCJA, however, specifically authorizes four independent bases of jurisdiction without prioritization. Under the UCCJA, a significant connection custody determination may have to be enforced even if it would be denied enforcement under the PKPA. The UCCJEA prioritizes home state jurisdiction in [N.J.S.A. 2A:34-65].
2. Clarification of emergency jurisdiction. There are several problems with the current emergency jurisdiction provision of the UCCJA § 3(a)(3)[, N.J.S.A. 2A:34-31a(3).] First, the language of the UCCJA does *241 not specify that emergency jurisdiction may be exercised only to protect the child on a temporary basis until the court with appropriate jurisdiction issues a permanent order. Some courts have interpreted the UCCJA language to so provide. Other courts, however, have held that there is no time limit on a custody determination based on emergency jurisdiction. Simultaneous proceedings and conflicting custody orders have resulted from these different interpretations.
Second, the emergency jurisdiction provisions predated the widespread enactment of state domestic violence statutes. Those statutes are often invoked to keep one parent away from the other parent and the children when there is a threat of violence. Whether these situations are sufficient to invoke the emergency jurisdiction provision of the UCCJA has been the subject of some confusion since the emergency jurisdiction provision does not specifically refer to violence directed against the parent of the child or against a sibling of the child.
The UCCJEA contains a separate section on emergency jurisdiction at Section 204 [, N.J.S.A. 34-68,] which addresses these issues.
3. Exclusive continuing jurisdiction for the State that entered the decree. The failure of the UCCJA to clearly enunciate that the decree-granting State retains exclusive continuing jurisdiction to modify a decree has resulted in two major problems. First, different interpretations of the UCCJA on continuing jurisdiction have produced conflicting custody decrees....
The second problem arises when it is necessary to determine whether the State with continuing jurisdiction has relinquished it. There should be a clear basis to determine when that court has relinquished jurisdiction. The UCCJA provided no guidance on that issue. The ambiguity regarding whether a court has declined jurisdiction can result in one court improperly exercising jurisdiction because it erroneously believes that the other court has declined jurisdiction. This caused simultaneous proceedings and conflicting custody orders. In addition, some courts have declined jurisdiction after only informal contact between courts and no opportunity for the parties to be heard. This raises significant due process concerns. The UCCJEA addresses these issues in Sections 110 [N.J.S.A. 2A:34-62], 202 [N.J.S.A. 2A:34-34-66], and 206 [N.J.S.A. 2A:34-70].
* * * *
5. Role of "Best Interests." The jurisdictional scheme of the UCCJA was designed to promote the best interests of the children whose custody was at issue by discouraging parental abduction and providing that, in general, the State with the closest connections to, and the most evidence regarding, a child should decide that child's custody. The "best interests" language in the jurisdictional sections of the UCCJA was not intended to be an invitation to address the merits of the custody dispute in the jurisdictional determination or to otherwise provide that "best interests" considerations should override jurisdictional determinations or provide an additional jurisdictional basis.

The UCCJEA eliminates the term "best interests" in order to clearly distinguish between the jurisdictional standards and the substantive standards relating to custody and visitation of children.
[9 U.L.A. 649-52 (emphasis added).]
*242 After analyzing the facts and circumstances of this case, we conclude that a jurisdictional analysis under either the applicable provisions of the UCCJA, or those of the recently-enacted UCCJEA, yields the same result. The provisions of the UCCJEA have essentially simplified the analysis of a child custody jurisdictional issue by codifying judicial interpretations of the UCCJA's provisions, and by separately outlining the prerequisites for the exercise of "initial," "modification," and "temporary emergency" jurisdiction. The embodiment of "home state" priority, the clarification of "emergency jurisdiction," the concept of "exclusive continuing jurisdiction," and the clarification that the "best interests" criteria of the UCCJA was not intended to invite an analysis of the merits of a custodial dispute when determining jurisdiction, persuade us that the Family Part erred in assuming custody jurisdiction pursuant to N.J.S.A. 2A:34-31a(2).
The fact that the Dominican Republic is not a signatory to the Hague Convention on the Civil Aspects of International Child Abduction, although always a factor to consider in the context of analyzing the criteria for international application set forth in N.J.S.A. 2A:34-51 of the UCCJA or N.J.S.A. 2A:34-57 of the UCCJEA, is of no concern in this jurisdictional dispute since this is not a case based upon an abduction. See Bless v. Bless, 318 N.J.Super. 90, 102, 723 A.2d 67 (App.Div.1998). Reasonable notice and opportunity to be heard are clearly components of the law of the Dominican Republic governing custodial disputes, and there is no basis to conclude that the courts of the Dominican Republic violate fundamental principles of human rights or do not base custody decisions on the evaluation of the best interests of the children. Although the procedures and criteria for evaluating the best interests of the children may not be as sophisticated or detailed as those contained in the statutory and case law of New Jersey, a finding that those procedures and criteria are the substantial equivalent of those in New Jersey is not the test to be applied when determining whether the jurisdictional criteria set forth in the UCCJA or UCCJEA should be given application. That is particularly so here, where defendant voluntarily subjected himself to the jurisdiction of the courts of the Dominican Republic in the divorce action.
The "emergency jurisdiction" and "removal" issues advanced by plaintiff clouded a proper jurisdictional analysis. The record clearly demonstrates that there was never an adequate, good-faith basis for requesting that the Family Part assume emergency jurisdiction under the provisions of N.J.S.A. 2A:34-31a(3). There is also no reason to believe that the courts of the Dominican Republic will not, upon proper application by plaintiff, provide reasonable notice, an opportunity to be heard, and consider any application made by him to change custody, prevent relocation of the children to Norway, or otherwise protect his right to maintain a meaningful parental relationship with the children. The lack of a structured approach to removal applications in the Dominican Republic similar in nature to that articulated in N.J.S.A. 9:2-2, as interpreted and applied by Baures v. Lewis, 167 N.J. 91, 115-17, 770 A.2d 214 (2001), is not the standard or a basis to assess subject-matter jurisdiction in an international or domestic custodial dispute. If it were, the principles of the UCCJA and UCCJEA, discussed herein, would be meaningless. We further conclude that our jurisdictional analysis comports with the central policy of the UCCJA, or for that matter the UCCJEA, that custody litigation occur in the place where the children and their family have the closest connection. See *243 Ivaldi, supra, 147 N.J. at 198, 685 A.2d 1319. That jurisdiction is the Dominican Republic.
The August 26, 2004 order assuming jurisdiction over the custody and relocation of these children is reversed, and the matter is remanded for entry of an order dismissing plaintiff's complaint. We hasten to add that these parties owe their children meaningful attempts to resolve the current disputes. Under the parties' prior agreement, the children were accorded a rich, meaningful relationship with both parents and they have flourished. Since June of July of this year, the conduct of both parents has thrown the lives of the children into disarray. Clearly, both children resent and have been negatively affected by the divorce that has resulted from the failure of the parties' interpersonal relationship. Both children need and want a close, meaningful relationship with both parents. It is the parents' primary obligation  not the courts  to allay their fears and assure that this fundamental desire of the children is fulfilled. Continued acrimony and bitterness are self-serving emotions that have no place in service of the best interests of these children, a fundamental parental obligation.
Reversed and remanded for entry of an order dismissing plaintiff's custody complaint and return of the children's passports to defendant. We do not retain jurisdiction. We are mindful of the reality that plaintiff may very well seek appeal from this decision on certification to the Supreme Court. Accordingly, we stay our decision for a period of twenty days to permit plaintiff an opportunity to file and serve a timely petition for certification pursuant to R. 2:12-3(a).
NOTES
[1] The order issued by the Family Part memorializing its decision to require the parties and children be interviewed by Dr. Montgomery was issued on August 12, 2004, nunc pro tunc.
[2] We recognize that defendant, in contemplation of the move to Norway, had surrendered her apartment in the Dominican Republic and had, at that point, declined to re-enroll the children in school there. However, defendant has since re-enrolled the children in their school in the Dominican Republic.