NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by E-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

2nd Circuit Court – Lebanon Family Division
No. 2013-781


IN THE MATTER OF ISMAIL YAMAN AND LINDA YAMAN

Argued: September 11, 2014
Opinion Issued: November 7, 2014


Ropes & Gray LLP, of Boston, Massachusetts (Kristen A. Fiore and Daniel V. Ward on the brief, and Mr. Ward orally), for the petitioner.


Vitt Brannen & Loftus, PLC, of Norwich, Vermont (Geoffrey J. Vitt, Barney L. Brannen, John B. Loftus, and Sarah J. Merlo on the brief, and Mr. Brannen orally), for the respondent.


LYNN, J. The respondent, Linda Yaman, appeals the decision of the Circuit Court (Carbon, J.), upon the recommendation of the Marital Master (Love, M.), denying her motion to contest the validity of a registered foreign order. We affirm.

I

The following facts were found by the trial court or are undisputed. The petitioner, Ismail Yaman, a Turkish citizen, and the respondent, a United States citizen, were married in Turkey in August 2000, and the respondent became a Turkish citizen in October 2000. Their first child, K.Y., was born in

March 2002, in the United States.  In January 2003, the family moved to Turkey.  The couple's second child, E.Y., was born in Turkey in August 2003.  In early to mid-2004, the respondent became suspicious that the petitioner was sexually abusing their older child.  In December 2004, the parties separated, and early the next year, the petitioner initiated divorce proceedings in the Turkish Family Court.  During the proceedings, the Turkish court required the children to be evaluated by a panel of three psychiatrists (the Tri-Partite Panel), who submitted a report to the court.  The court also appointed three independent experts, a psychologist, a pedagogue,[1] and a social service provider (the Supervisors), who reported to the Turkish Family Court and made a custody recommendation.  On March 13, 2006, after conducting six hearings in which the court considered evidence from both parties and from the independent experts, the court rejected the respondent's claim that the petitioner had abused the children, and issued an order granting sole legal custody of the children to the petitioner and granting the respondent visitation.  The respondent appealed the order to the Supreme Court of Appeals of Turkey on two occasions, and both times the appellate court affirmed the family court's order.  On August 3, 2007, the family court finalized its order.

Within weeks after the family court's order became final, and without notice to the petitioner, the respondent fled Turkey with the children by engaging the services of a self-proclaimed "snatch back" specialist.  The respondent first went to Greece, and then to Andorra, which she knew was not a signatory to the Hague Convention, where she and the children resided from October 2007 to April 2010.  The respondent eventually petitioned the United States Department of State to grant her children passports.  In March 2010, the State Department issued the children single-use, direct return passports to the United States.  The respondent and her children moved to the United States in April 2010 and settled in New Hampshire in May 2010.

After years of searching, the petitioner, who continues to reside in Turkey, was informed in December 2011 that the respondent and the children were living in New Hampshire.  The petitioner filed a petition pursuant to Article 2 of the Hague Convention on the Civil Aspects of International Child Abduction[2] and the International Child Abduction Remedies Act (ICARA) with the United States District Court for the District of New Hampshire[3].  Following a three-day evidentiary hearing, the court ruled that the return of the children to Turkey would not pose a grave risk of harm to them because the respondent had not established that the petitioner abused them.  The court also found, however, that the respondent had established that the children were "settled"

---

[1] Although the term is not often used in this country to describe a person's occupation or calling, a "pedagogue" means a teacher.  See Random House Webster's Unabridged Dictionary 1428 (2d ed. 2001).

[2] T.I.A.S. No. 11,670, 1343 U.N.T.S. 89 (Oct. 25, 1980), reprinted in 51 Fed. Reg. 10,494 (Mar. 26, 1986).

[3] 42 U.S.C. §§ 11601 et seq.

in New Hampshire within the meaning of Article 12 of the Hague Convention; in light of this finding, the court ruled that it lacked the authority to order the children's return to Turkey. Alternatively, the court ruled that, given the facts of the case, even if it did have the authority to do so, it would not order the return of the children to Turkey. The petitioner appealed to the United States Court of Appeals for the First Circuit. See Yaman v. Yaman, 730 F.3d 1 (1st Cir. 2013). The appeals court determined that the district court erred in ruling that it lacked authority to order the return of "settled" children, id. at 20-21, but affirmed the trial court's alternative ruling denying return of the children on equitable grounds as a sustainable exercise of discretion. Id. at 22-23.

During the federal court proceedings, the petitioner also sought enforcement of the Turkish custody order pursuant to New Hampshire's Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA), RSA chapter 458-A (Supp. 2013). The district court declined to exercise supplemental jurisdiction over this claim, dismissing it without prejudice so that the petitioner could pursue it in state court. Following that decision, the petitioner instituted the present action in the New Hampshire Circuit Court. In this proceeding, the parties agreed that collateral estoppel applied to the findings of fact made by the federal court. The circuit court found that the Turkish Family Court exercised jurisdiction over the initial custody determination in substantial conformity with the UCCJEA, and that both parties had an opportunity to be heard during the Turkish proceedings. The court also found that the respondent failed to meet her burden of showing that the Turkish proceedings violated fundamental principles of human rights. Accordingly, the court denied the respondent's motion to invalidate the Turkish custody order, confirmed the registration of the order, and ordered the return of the children to the petitioner's custody. Recognizing that enforcement of its order would be difficult for the children, the court stayed the order, first for 45 days, and subsequently, on the respondent's motion, pending the completion of this appeal.

II

Whether a New Hampshire court must enforce a foreign custody order is governed by the UCCJEA, RSA chapter 458-A. To resolve the issues in this appeal, we must construe that statute. In so doing, our review of the trial court's decision is de novo. In the Matter of Lyon & Lyon, 166 N.H. ___, ___, 95 A.3d 630, 632 (2014). When examining the language of a statute, we ascribe the plain and ordinary meaning to the words used. Id. We interpret legislative intent from the statute as written and will not consider what the legislature might have said or add language that the legislature did not see fit to include. Id. When the language of a statute is unambiguous, we do not look beyond it for further indications of legislative intent. Id. However, when the statutory language is ambiguous or subject to more than one reasonable interpretation, we review legislative history to aid our analysis. Id.

3

Before addressing the respondent's specific arguments, we provide an overview of the UCCJEA. New Hampshire adopted the UCCJEA in 2009 and it took effect in December 2010. The UCCJEA replaced the Uniform Child Custody Jurisdiction Act (UCCJA), which New Hampshire had adopted in 1979. The UCCJEA, which was first promulgated by the National Conference of Commissioners on Uniform State Laws (NCCUSL) in 1997, sought to resolve issues that had arisen over decades of courts interpreting and applying the UCCJA. Unif. Child Custody Jurisdiction & Enforcement Act, Prefatory Note, 9-IA U.L.A. 649-53 (1999). The NCCUSL enumerated the UCCJEA's purposes:

1) Avoid jurisdictional competition and conflict with courts of other States in matters of child custody which have in the past resulted in the shifting of children from State to State with harmful effects on their well-being;

2) Promote cooperation with the courts of other States to the end that a custody decree is rendered in that State which can best decide the case in the interest of the child;

3) Discourage the use of the interstate system for continuing controversies over child custody;

4) Deter abductions of children;

5) Avoid relitigation of custody decisions of other States in this State;

6) Facilitate the enforcement of custody decrees of other States.

Unif. Child Custody Jurisdiction & Enforcement Act § 101, cmt., 9-IA U.L.A. 657 (1999).

The UCCJEA provides for two primary types of jurisdiction. First, a court may have jurisdiction to make an initial custody decision. RSA 458-A:12 (Supp. 2013). To have initial jurisdiction, the state must be the "home state of the child on the date of the commencement of the proceeding," or have been the "home state of the child within 6 months before the commencement of the proceeding" and "a parent or person acting as a parent continues to live in this state." RSA 458-A:12, I(a). A court may also have jurisdiction to issue an initial custody order if no other state is the child's home state or the court in the child's home state has declined jurisdiction, and the child and at least one parent has a significant connection to the state and substantial evidence concerning the child is present in the state. RSA 458-A:12, I(b).

Second, a court may have jurisdiction to modify a custody order. RSA 458-A:14 (Supp. 2013). A court may modify an out-of-state custody order only

if the state meets the criteria for jurisdiction under RSA 458-A:12 and "the other state determines it no longer has exclusive, continuing jurisdiction . . . or that a court of this state would be a more convenient forum," RSA 458-A:14, I, or a court of either state "determines that the child, the child's parents, and any person acting as a parent do not presently reside in the other state." RSA 458-A:14, II.

Once a court of this state has issued an order pursuant to either RSA 458-A:12 or :14, the court has exclusive, continuing jurisdiction until:

> (a) A court of this state determines that neither the child, nor the child and one parent, nor the child and a person acting as a parent have a significant connection with this state and that substantial evidence is no longer available in this state concerning the child's care, protection, training, and personal relationships; or

> (b) A court of this state or a court of another state determines that the child, the child's parents, and any person acting as a parent do not presently reside in this state.

RSA 458-A:13, I (Supp. 2013). The drafters of the UCCJEA clarified that the phrase "'a court of this State' . . . makes it clear that the original decree State is the sole determinant of whether jurisdiction continues. A party seeking to modify a custody determination must obtain an order from the original decree State stating that it no longer has jurisdiction." Unif. Child Custody Jurisdiction & Enforcement Act § 202, cmt. 1, 9-IA U.L.A. 674 (1999). In other words, a court of a state that did not issue the original custody order cannot make such jurisdictional determinations. The court that has jurisdiction, however, may decline to exercise that jurisdiction "if it determines that it is an inconvenient forum under the circumstances and that a court of another state is a more appropriate forum." RSA 458-A:18, I (Supp. 2013).

New Hampshire "shall recognize and enforce a child-custody determination of a court of another state if the latter court exercised jurisdiction in substantial conformity with this chapter or the determination was made under factual circumstances meeting the jurisdictional standards of this chapter and the determination has not been modified in accordance with this chapter." RSA 458-A:24, I (Supp. 2013). With the exception discussed below, the provisions of the UCCJEA apply not only to custody determinations made by courts of New Hampshire's sister states within the United States, but also to custody determinations rendered by courts of foreign countries. See RSA 458-A:4 (Supp. 2013). The UCCJEA does not require reciprocity; an order from a foreign court may be enforced even if that state or country has not adopted the UCCJEA or an equivalent statute. S.B. v. W.A., 959 N.Y.S.2d 802,

5

809 (Sup. Ct. 2012); cf. Klont v. Klont, 342 N.W.2d 549, 550 (Mich. Ct. App. 1983) (construing UCCJA).

Although RSA 458-A:24, I, requires the courts of this state to enforce a child custody determination made by a court of another state if the other state exercised jurisdiction in substantial conformity with the UCCJEA, there are certain exceptions to this obligation, two of which are at issue in this case. First, the UCCJEA does not apply to custody determinations "made without notice or an opportunity to be heard." RSA 458-A:16, II (Supp. 2013). Second, as to custody determinations made in foreign countries, a court "need not apply this chapter if the child custody law of a foreign country violates fundamental principles of human rights." RSA 458-A:4, III (Supp. 2013).

In addition to the two primary types of jurisdiction, the UCCJEA allows a court to exercise a third type – temporary emergency jurisdiction – whether or not a custody determination has already been made. RSA 458-A:15 (Supp. 2013). A court may exercise temporary emergency jurisdiction "if the child is present in this state and the child has been abandoned or it is necessary in an emergency to protect the child because the child, or a sibling or parent of the child, is subjected to or threatened with mistreatment or abuse." RSA 458-A:15, I. If a court exercises this type of jurisdiction, and there was already a custody order in place, the court "shall immediately communicate" with the court that made the earlier determination "to resolve the emergency, protect the safety of the parties and the child, and determine a period for the duration of the temporary order." RSA 458-A:15, IV. "Unless the court issues a temporary emergency order pursuant to RSA 458-A:15, upon a finding that a petitioner is entitled to immediate physical custody of the child, the court shall order that the petitioner may take immediate physical custody of the child," RSA 458-A:31, I (Supp. 2013), and the court "may not stay an order enforcing a child-custody determination pending appeal." RSA 458-A:35 (Supp. 2013).

III

The respondent neither contests that an initial custody order was issued by the Turkish court, nor argues that the order has been modified or vacated. The respondent does contend, however, that the courts of this state should not enforce the order for a number of reasons. First, she argues that she was deprived of the opportunity to be heard during the proceedings in Turkey, and for this reason, the order is not entitled to enforcement, pursuant to RSA 458-A:16, II.

In response, the petitioner contends that the respondent is collaterally estopped from arguing that she was denied an opportunity to be heard because a United States Department of State final administrative decision ruled that she had an opportunity to be heard during the Turkish custody proceedings.

6

We need not decide this issue because we conclude that the respondent was not denied an opportunity to be heard in the Turkish Family Court.

The respondent contends that she did not have the opportunity to be heard because she was not provided with, or allowed access to, an interpreter during the Turkish proceedings, which were conducted entirely in Turkish. The respondent claims to have limited proficiency in Turkish, and argues that although she was represented by counsel, her attorney did not speak English. The respondent also argues that she was denied the opportunity to be heard because she was unable to obtain discovery regarding the court-appointed experts; to challenge the admissibility of hearsay, the presence of bias, or the inaccuracies contained in the experts' reports; to tell her story in court; and to cross-examine the petitioner.

Neither the UCCJEA itself, nor its official comments, define "opportunity to be heard." We have previously held that "[t]he right to be heard in custody and visitation cases encompasses the right to call and cross-examine witnesses, to be informed of all adverse evidence, and to challenge such evidence." In the Matter of Kosek & Kosek, 151 N.H. 722, 728 (2005). However, this standard describes the requirements that must be met to satisfy procedural due process for purposes of proceedings that occur in our own courts, i.e., the courts of New Hampshire and other jurisdictions within the United States. In contrast, the matter at hand requires us to consider the meaning of "opportunity to be heard" in the context of courts of foreign countries; and, in doing so, we reject the respondent's contention that we must apply American standards of due process. When considering procedural standards in courts different from our own, the analysis is not about our views of proper procedure. See Simmonds v. Parks, 329 P.3d 995, 1016 (Alaska 2014) (discussing due process requirements under the full faith and credit clause of the Indian Child Welfare Act when granting comity to a parental rights termination and child custody order). Rather, the "opportunity to be heard" analysis "is flexible, and the concept should be applied in a manner which is appropriate in the terms of the nature of the proceeding" in the foreign court. Id. (quotation omitted). The question of whether a party had "notice and an opportunity to be heard" within the meaning of RSA 458-A:16, II should be interpreted as requiring that the party had "a full and fair opportunity to be heard before an impartial tribunal that conducted the proceedings in a regular fashion." Id. at 1015-16 (quotation omitted); accord Poluhovich v. Pellerano, 861 A.2d 205, 242 (N.J. Super. Ct. App. Div. 2004) (stating that "a finding that those procedures and criteria [of the courts of the Dominican Republic] are the substantial equivalent of those in New Jersey is not the test to be applied when determining whether the jurisdictional criteria set forth in the UCCJA or UCCJEA should be given application").

Several courts have addressed this issue under the UCCJEA. In In re T.L.B., 272 P.3d 1148 (Colo. App. 2012), a father filed a claim under the Hague

Convention to obtain the return of his children, who had been taken by their mother from Canada to Colorado. Id. at 1152. The mother petitioned Colorado to exercise jurisdiction over the matter pursuant to the UCCJEA, even though a Canadian custody order had been issued, on the grounds that her children were at risk of sexual abuse by the father. Id. at 1151-52. The mother claimed that she had not been given the opportunity to be heard in the Canadian proceedings, in violation of her due process rights. Id. at 1157. The court found that she had the opportunity to be heard because the Canadian court "conducted a lengthy hearing, heard testimony from mother, father, and multiple expert witnesses, and then rejected mother's allegations of father's abuse and ordered a period of reintegration therapy before the children were reunited with father." Id.

Other courts have found that a party had the opportunity to be heard within the meaning of the UCCJEA if the party purposefully failed to attend the hearing in the foreign country. See Klont, 342 N.W.2d at 550-51; Dyce v. Christie, 17 So. 3d 892, 893 (Fla. Dist. Ct. App. 2009). And courts also have found that a party had the opportunity to be heard if he or she was represented by counsel in the foreign court, see Poluhovich, 861 A.2d at 236, even if the party did not personally attend the proceedings, see Bliss v. Bliss, 733 A.2d 954, 959-60 (D.C. 1999); Custody of a Minor (No. 3), 468 N.E.2d 251, 255 (Mass. 1984).

Here, the respondent was present and represented by counsel during the Turkish court proceedings. The Turkish Family Court accepted evidence from both parties as well as from multiple experts during the lengthy proceedings. Like the Canadian court in T.L.B., the Turkish court heard and addressed the respondent's allegations of abuse by the petitioner by ordering evaluations and counseling for the children both before and after its decision. The Supreme Court of Appeals of Turkey also heard two appeals of the case at the request of the respondent. The respondent offers nothing to show that the custody proceeding somehow diverged from the normal procedures followed in Turkish courts or that her particular case was arbitrarily decided. Rather, her complaints have more to do with the Turkish process in general and how it differs from our own. However, as explained above, our procedures and standard of due process are not the proper metric under the UCCJEA. Instead, we use a flexible standard that considers whether the respondent was given an opportunity to be heard consistent with the nature and customs of Turkish proceedings. The respondent has not shown that she received anything less than "a full and fair opportunity to be heard before an impartial tribunal that conducted the proceedings in a regular fashion." Simmonds, 329 P.3d at 1015-16 (quotation omitted).

Nonetheless, the respondent argues that she was denied an opportunity to be heard because, although represented by counsel in the Turkish courts, the proceedings were conducted in Turkish, a language in which she is not

8

fluent, her lawyer did not speak English, and she was not allowed to have an interpreter. The respondent claims that this deprived her of the right to fully understand the Turkish court proceedings simultaneously as they were occurring. We do not find this to amount to a denial of the opportunity to be heard. First, aside from her conclusory proffer, see infra at p. 13, the evidence in the record regarding the respondent's lack of ability to participate due to the asserted language barrier consists merely of an affidavit from an interpreter that the respondent had hired to translate for her on one particular day of the Turkish court proceedings. That affidavit indicates that the judge denied the interpreter's request to translate the proceedings because he found no need for such simultaneous translation, given that what was occurring that day was merely the parties' submission of documents to the court. The judge instructed the respondent that she could have the documents translated at a later time, and he permitted the interpreter to immediately translate these instructions for the respondent's benefit. The record contains no evidence that the respondent was unable to obtain an interpreter for other phases of the court proceedings, in which there may have been a demonstrable need for simultaneous translation, or that she was unable to adequately communicate with her attorney.[4]

In support of her argument that her lack of proficiency in Turkish deprived her of the opportunity to be heard, the respondent points to our recent adoption of the New Hampshire Judicial Branch Language Services Plan, see N.H. Sup. Ct. Order of Dec. 24, 2013, and our recent decision in State v. Jur, 166 N.H. ___, 94 A.3d 283 (2014). Once again, however, these authorities set forth standards and procedures that are applicable under New Hampshire law, and Jur, in particular, addresses the constitutional standards that apply in criminal cases. Although the respondent correctly observes that under court procedures followed in jurisdictions with a common law heritage, such as our own, it is difficult for a language-impaired person to meaningfully participate in the proceedings without the availability of simultaneous translation services, the need for this level of services appears less important in countries, such as Turkey, which follow the civil law system utilized by many European countries. For example, much of the evidence relied on by courts in civil law countries is presented through written submissions and not by oral testimony. See Gregory F. Hauser, Representing Clients from Civil Law Legal Systems in U.S. Litigation: Understanding How Clients from Civil Law Nations View Civil Litigation and Helping Them Understand U.S. Lawsuits, 17-AUT Int'l L. Practicum 129, 133, 137 (2004) (describing differences between civil and common law systems, including the increased emphasis on written

---

[4] For example, the record contains no affidavit from the respondent's Turkish counsel (or, for that matter, anyone else she interacted with during the Turkish court proceedings) indicating that her Turkish language deficiencies and/or inability to secure an interpreter significantly affected her ability to present to the court information or issues favorable to her interests or the interests of the children.

submissions under civil law). In the absence of a far stronger showing than respondent has made, we cannot say that the unavailability of simultaneous interpreter services in the Turkish court proceedings amounted to a deprivation of the opportunity to be heard.

In sum, we hold that the respondent was not denied notice or an opportunity to be heard in the Turkish Family Court, and therefore she cannot rely upon RSA 458-A:16, II to defeat enforcement of that court's custody order.

IV

The respondent next argues that the Turkish court's custody order is unenforceable pursuant to RSA 458-A:4, III. That section of the UCCJEA states: "A court of this state need not apply this chapter if the child custody law of a foreign country violates fundamental principles of human rights." RSA 458-A:4, III. The respondent claims that the lack of due process during the Turkish proceedings, as well as the fact that Turkish custody law does not provide for joint custody, violates fundamental principles of human rights.

Neither the statute nor the comments to the UCCJEA define "fundamental principles of human rights" and "th[e] Act takes no position on what laws relating to child custody would violate fundamental freedoms." Unif. Child Custody Jurisdiction & Enforcement Act § 105, cmt., 9-IA U.L.A. 662 (1999). However, the comments allude to

> a similar provision in the Hague Convention on the Civil Aspects of
> Child Abduction, which permits a country to refuse to return a
> child if the return would violate "the fundamental principles of the
> requested State relating to the protection of human rights and
> fundamental freedoms," which has been interpreted by the United
> States Department of State as "utterly shock[ing] the conscience or
> offend[ing] all notions of due process."

Toland v. Futagi, 40 A.3d 1051, 1058 (Md. 2012). That interpretation makes clear that the exception is meant to be "invoked only in the most egregious cases." Unif. Child Custody Jurisdiction & Enforcement Act § 105, cmt., 9-IA U.L.A. 662 (1999). The standard is meant to be stringent because courts might "harbor doubts about the law of another country, particularly when that country's legal system, culture, religion, and language differ from ours." Poluhovich, 861 A.2d at 235-36.

The comments to the UCCJEA also clarify that the analysis is meant to focus on the foreign jurisdiction's substantive law, and not its legal system or how the law is implemented. Unif. Child Custody Jurisdiction & Enforcement Act § 105, cmt., 9-IA U.L.A. 662 (1999). Our only concern is the law itself; how the law is applied is a question for the foreign court. Dyce, 17 So. 3d at 893.

That a foreign jurisdiction's law is different from ours is not an indication that it violates fundamental principles of human rights, and, therefore, that is not the test under the UCCJEA.  See Poluhovich, 861 A.2d at 242; Matter of Serihy M. v. Olena O.M., No. 164291, 2011 WL 5579179, at *4 (N.Y. Fam. Ct. Nov. 7, 2011).

The respondent argues that the Turkish procedures deprived her of due process, a fundamental right, which led to the deprivation of her rights as a parent.  Although due process is a basic right in our courts, it is not the standard under this section of the UCCJEA.  See In re P.M.M., No. 67533-8-I, 2012 WL 1921380, at *7 (Wash. Ct. App. May 29, 2012) ("The UCCJEA provides that the superior court may decline to apply the statute if a foreign jurisdiction violates fundamental principles of human rights, but makes no mention of due process.").  Further, a complaint about procedures or lack of due process is not a critique of the substantive law itself.  See Dyce, 17 So. 3d at 893.

The respondent argues that one aspect of the substantive law – that it does not provide for joint custody – violates fundamental principles of human rights.  We do not find this aspect of the law to be the type of "egregious" or "utterly shocking" violation that the UCCJEA contemplates as a reason to refuse to enforce a custody order.  This is especially true here because, although the petitioner alone was awarded legal custody, the respondent was awarded substantial visitation rights.

For these reasons, we conclude that the child custody law of Turkey does not violate fundamental principles of human rights, and thus affords no basis for us to decline to enforce the Turkish court's order.

V

The respondent next argues that applying the UCCJEA in this case would contravene New Hampshire's overarching public policy because it would not be in the children's best interest to return to Turkey to live with the petitioner.  The short answer to this argument is that the issue before us "is not what is in the best interest of the child[ren].  Rather the issue now before the court is which jurisdiction has the authority to engage in that inquiry."  In re Marriage of Nurie, 176 Cal. App. 4th 478, 492 (Ct. App. 2009) (quotation omitted).  The UCCJA, the predecessor to the UCCJEA, contained language concerning the child's "best interest," but this language was purposely removed from the UCCJEA "in order to clearly distinguish between the jurisdictional standards and the substantive standards relating to custody and visitation of children."  Unif. Child Custody Jurisdiction & Enforcement Act, Prefatory Note, 9-IA U.L.A. 652 (1999).  Although we are not insensitive to the children's best interests, we must respect our limited role under the UCCJEA, and keep our focus on the jurisdictional question presented.  See In re Marriage of

11

Ieronimakis, 831 P.2d 172, 178 (Wash. Ct. App. 1992) ("The only other basis for . . . allowing jurisdiction in Washington courts is the belief that the return of the children to Greece at this point would place them in an intolerable situation. Of course this argument addresses the custody issue which may only be considered after jurisdiction is established.").

That the children's lives and interests have changed since the Turkish order was issued does not affect the determination of jurisdiction under this law. Id. (stating that the present situation that resulted from the mother abducting the children and living with them in another country "should not be retroactively applied to control a decision as to jurisdiction"). To allow new facts and circumstances brought about by an abducting parent to be considered would "circumvent[] the intent of the jurisdiction laws." In re Marriage of Donboli, No. 53861-6-I, 2005 WL 1772328, at *11 (Wash. Ct. App. July 18, 2005).

As the stated purposes of the UCCJEA make clear, by enforcing the order that was previously issued, we are respecting the jurisdiction and orders of foreign courts; because doing so often leads to quicker resolutions and prevents relitigation of custody disputes, the interest of children is advanced. Unif. Child Custody Jurisdiction & Enforcement Act § 101, cmt., 9-IA U.L.A. 657 (1999). A foreign court can also examine the facts that exist today and act in the best interest of the children. Marriage of Ieronimakis, 831 P.2d at 178. In this case, the Turkish court held multiple hearings, accepted evidence from various neutral experts, and ordered evaluations of the children both before rendering a decision and afterwards; the decision itself states that its custody decree was best for the children. There is no reason for us to believe that the Turkish court will not again consider the best interests of the children, should the respondent bring this matter before it.

The respondent argues that when the New Hampshire legislature enacted the UCCJEA, it did not fully appreciate the ramifications of international custody disputes. However, the important point is that the legislature did enact this statute, including RSA 458-A:4, which unambiguously applies the provisions of the act to custody orders of foreign countries. Because we interpret legislative intent from the statute as written, In the Matter of Lyon & Lyon, 166 N.H. at ___, 95 A.3d at 632, we presume that the legislature intended the statute to apply as written.

VI

The respondent next argues that her due process rights were violated because she was not afforded an evidentiary hearing before the circuit court in New Hampshire prior to its enforcement of the Turkish custody order. The record before us does not support this claim.

12

When the petitioner instituted this action to enforce the Turkish custody order, the respondent moved to contest the order, and the court scheduled a hearing on the matter. At that hearing, there was nothing to prevent the respondent from presenting testimony or other evidence in support of her position that the Turkish order should not be enforced. Instead of presenting evidence, however, the respondent proceeded by offers of proof. Her counsel represented to the court that the respondent would testify to the various alleged deficiencies in the Turkish court proceedings – the absence of an interpreter, inability to cross-examine witnesses or experts or see reports, etc. – that she claimed denied her due process. From all that appears, the court considered these offers of proof along with the other evidence presented at the hearing, including English translations of the Tri-Partite Panel's report, the Supervisor's report, and the Turkish court's order. While the respondent was free to proceed in this fashion, the court was not required to credit her offers of proof (any more than it would have been required to credit live testimony by the respondent). See In the Matter of Henry & Henry, 163 N.H. 175, 181 (2012) ("As the fact finder, the trial court was entitled to accept or reject, in whole or in part, the testimony of any witness or party, and was not required to believe even uncontroverted evidence."). Given the substantial evidence in the record showing that the respondent was afforded ample opportunity to be heard in the Turkish court proceedings, we cannot say that the circuit court lacked a sufficient basis to order the enforcement of the Turkish court's custody order without holding a further hearing on the matter.

The respondent argues that she requested a full evidentiary hearing "in the event that the Family Division registered the Turkish order." To the extent that the respondent argues that the circuit court should have made a preliminary determination of whether it would enforce the order and, only then, hold an evidentiary hearing, no such procedures are contemplated by the UCCJEA. In fact, such a process would be inconsistent with the UCCJEA, which generally aims for the speedy resolution of challenges to the enforcement of out of state or foreign custody orders. Under RSA 458-A:26 (Supp. 2013), the parties are entitled to a hearing, which the circuit court provided in this case. To countenance the kind of bifurcated hearing procedure that the respondent requested would unduly prolong the enforcement procedure contemplated by the UCCJEA.

VII

Finally, the respondent contends that, because the circuit court stayed the enforcement of its order, which, she argues, could only be done if the court exercised its temporary emergency jurisdiction under RSA 458-A:15, the court erred by not communicating with the Turkish court before ordering the children returned to Turkey. The respondent argues that, in the event we find the Turkish order enforceable, we should remand the case to the circuit court so that it can communicate with the court in Turkey to ascertain whether the

13

Turkish court is willing "to cede jurisdiction to New Hampshire under an inconvenient forum analysis." We reject this argument because it is based on a misunderstanding of the role of temporary emergency jurisdiction under the UCCJEA.

A New Hampshire court may exercise temporary emergency jurisdiction, even if there is an enforceable custody order from another jurisdiction in place, if it is necessary to protect a child present in the state because the child "is subjected to or threatened with mistreatment or abuse." RSA 458-A:15, I. If a court exercises this emergency jurisdiction while a prior custody determination exists, the court must "immediately communicate with the other court" to resolve the emergency. RSA 458-A:15, IV. To support her argument, the respondent points out that when the court finds that a petitioner is entitled to immediate physical custody of the child, RSA 458-A:31 requires the court to order "that the petitioner may take immediate physical custody of the child" "[u]nless the court issues a temporary emergency order pursuant to RSA 458-A:15." RSA 458-A:31, I (Supp. 2013). The respondent argues that, based upon these provisions, it follows that because the circuit court stayed its order to help the children adjust to the transition back to Turkey and into the petitioner's custody, the court must have exercised temporary emergency jurisdiction, and, therefore, the court should have communicated with the Turkish court.

We find that the circuit court did not invoke temporary emergency jurisdiction under RSA 458-A:15. Although the court did stay its order, first for 45 days, and later for the duration of this appeal, nothing in these orders purports to invoke temporary emergency jurisdiction under RSA 458-A:15. Moreover, even if we assume that the court intended to invoke temporary emergency jurisdiction, that decision was erroneous because such jurisdiction was not warranted in this case.

The comments to the UCCJEA explain that the exercise of temporary emergency jurisdiction is intended to be narrowly circumscribed. Unif. Child Custody Jurisdiction & Enforcement Act § 204, cmt., 9-IA U.L.A. 677 (1999) ("'an extraordinary jurisdiction reserved for extraordinary circumstances'"). There is no evidence in the record that demonstrates that the children were or are subjected to or threatened with mistreatment or abuse. Instead, the harm facing the children is the potential emotional turmoil of moving to a new country to live with a parent with whom they have spent little time since their abduction. This is not mistreatment or abuse. See Kalman v. Fuste, 52 A.3d 1010, 1022 (Md. Ct. Spec. App. 2012) (holding that potential negative impacts of living with one parent and the stress of relocating to a new state did not "demonstrate or express the sort of immediate danger inherent in the words 'abuse' or 'mistreatment'"). Rather, the potential stress and emotional pain is an unfortunate effect of the circuit court correctly applying the UCCJEA and enforcing a valid custody order. The respondent's argument, in essence,

14

asserts that the court, or the law itself, is the source of mistreatment or abuse merely by enforcing the custody order in the manner contemplated by the UCCJEA. If emergency jurisdiction could be invoked whenever a court enforces an order pursuant to other sections of the act, the purposes of the UCCJEA would be substantially undermined. We cannot countenance this result.

Because the circuit court did not, or should not, have exercised temporary emergency jurisdiction, the court's stay of its order violates not only RSA 458-A:31, but also RSA 458-A:35 (prohibiting court from staying a custody enforcement order pending appeal, absent a basis for invoking temporary emergency jurisdiction). However, because the court's error in granting the stay obviously worked to the respondent's benefit, she has no standing to challenge it on appeal. See Libertarian Party of N.H. v. Sec'y of State, 158 N.H. 194, 196 (2008) (holding that a party lacked standing when the party had not suffered any harm against which the law was designed to protect, and the relief sought was for the benefit of another party who had chosen not to request it).

The respondent also argues that the circuit court, by not contacting the Turkish court, deprived Turkey of the chance to cede jurisdiction to New Hampshire. However, nothing in the UCCJEA requires a court of this state to communicate with a foreign court in the circumstances presented here. It is proper, as the circuit court did, to enforce the order as it is and let the Turkish court, upon request, make a determination about whether the transfer of custody to the petitioner should occur immediately or over some transition period.

VIII

For the reasons stated above, we hold that the circuit court did not err in granting enforcement of the Turkish custody order.

<u>Affirmed</u>.

DALIANIS, C.J., and HICKS, CONBOY, and BASSETT, JJ., concurred.

15